*Estate of Peter Castruccio, et al. v. Sadie M. Castruccio*, No. 1023, Sept. Term 2018. Opinion by Arthur J.

**ESTATE ADMINISTRATION—SPECIAL ADMINISTRATOR'S POWER TO HIRE COUNSEL WITHOUT COURT APPROVAL**

A special administrator of an estate may engage counsel to prosecute and defend litigation on behalf of the estate without court approval under the power to "collect, manage and preserve property" granted by section 6-403 of the Estates and Trusts Article.

**ATTORNEYS' FEES—ESTIMATION OF FUTURE FEES IN FEE PETITION**

When a fiduciary of a decedent's estate cannot make a reasonable, good faith estimate of the likely future fees, the fiduciary is not required to make such an estimate in a petition for attorneys' fees under Md. Rule 6-416.

**ATTORNEYS' FEES—COMPENSATION FOR PARTICPATION IN A WILL CONSTRUCTION ACTION**

Fiduciaries of an estate who defend against challenges to their reasonable, good faith construction of the will are acting to benefit the estate by effectuating the testator's intent and are entitled to attorneys' fees for their participation in the action.

**ATTORNEYS' FEES—DETERMINATION OF REASONABLE FEE— LODESTAR METHOD**

The lodestar method of calculating attorneys' fees does not apply to the determination of reasonable attorneys' fees for a fiduciary of an estate. Courts should consider the amount of requested fees in relation to the size of the estate when a fiduciary is seeking to shift the costs of the litigation to the estate.

**ATTORNEYS' FEES—DETERMINATION OF REASONABLE FEE— "LOCALITY" FACTOR**

Under Md. Rule 19-301.5, a court may not confine the limits of a reasonable hourly rate to fees "customarily charged in the locality" in cases where qualified local counsel was not readily available. Court should consider whether local counsel was willing to take the case, whether local counsel with necessary expertise was available, and whether the complexity of the case warranted the rates charged by the attorneys when reviewing the locality's conventional rates.

**ATTORNEYS' FEES—DENIAL OF HOURS BILLED—OPPORTUNITY TO BE HEARD**

A court must give the party petitioning for attorneys' fees an opportunity to address the court's concerns with the requested fees before reducing the hours billed by the petitioner's attorneys. Attorneys for the petitioners are not required to provide explicit details for each hour billed in their petition, and a court must provide a concise but clear explanation for its decision to award all of part of the requested fee to provide an appropriate basis for meaningful appellate review.

**ATTORNEYS' FEES—DENIAL OF HOURS BILLED—FEES FOR UNSUCCESSFUL PRE-TRIAL MOTIONS**

A court cannot deny requested attorneys' fees incurred in connection with pretrial motions filed by the attorneys solely because those motions were not granted. Rather, the court should conduct a nuanced inquiry into the reasonableness of the arguments that were advanced in those motions and the extent, if any, to which they may have benefitted the estate.

**ATTORNEYS' FEES—DETERMINATION OF REASONABLE FEE— RELEVANT FACTORS BESIDES THOSE SET FORTH IN RULE 1.5**

Maryland courts are permitted to consider relevant factors besides those set forth in Md. Rule 19-301.5 when calculating a reasonable fee award for an estate's attorneys. Courts may also consider: (1) the actions of the beneficiaries in relation to the length or complexity of the litigation; (2) whether the beneficiaries approved of or instigated the litigation; and (3) whether the fiduciary of the estate had an opportunity to reach a reasonable settlement with the opposing party.

**EVIDENCE—ADMISSIBILITY OF STATEMENT MADE IN MEDIATION**

In general, all statements made in a court-ordered mediation are effectively inadmissible under the Maryland Mediation Confidentiality Act, even if they are offered for some purpose other than proving the "validity, invalidity, or amount of a civil claim in dispute" under Md. Rule 5-408.

Circuit Court for Anne Arundel County
Case No. C-02-CV-16-000278

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1023

September Term, 2018

_____

ESTATE OF PETER CASTRUCCIO, ET AL.

v.

SADIE M. CASTRUCCIO

_____

Graeff,
Nazarian,
Arthur,

JJ.

_____

Opinion by Arthur, J.

_____

Filed:  July 29, 2020

*Judge Timothy E. Meredith did not participate in the Court's decision to designate this opinion for publication pursuant to Maryland Rule 8-605.1.

Pursuant to Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This case marks yet another appeal to this Court concerning the administration of the estate of Dr. Peter Adalbert Castruccio.[1]

While defending against a series of lawsuits initiated by Dr. Castruccio's widow, the fiduciary of the estate submitted an interim petition for attorneys' fees and expenses to the Orphans' Court for Anne Arundel County. He requested that the fees be paid out of the estate's assets.

Mrs. Castruccio objected to the petition, principally on the ground that the fiduciary had not obtained the orphans' court's approval to retain one of the firms that represented him. Darlene Barclay, the principal beneficiary of the estate, objected on the ground that the fees should be charged against Mrs. Castruccio's share of the estate because she had allegedly acted in bad faith during the litigation. The orphans' court denied the exceptions, and Ms. Barclay and Mrs. Castruccio filed de novo appeals to the Circuit Court for Anne Arundel County.

After a six-day trial, the circuit court permitted the attorneys' fees and expenses to be paid out of the estate's assets. The court took issue, however, with the lawyers' hourly rates and with the number of hours billed by counsel for the estate. The court significantly reduced the hourly rates of most of the estate's attorneys and cut nearly a

---

[1] For a summary of the Castruccio cases considered by this Court through September 2019, see *Matter of Estate of Castruccio*, No. 69, Sept. Term 2018, 2019 WL 4467146, at *1 n.1 (Md. Ct. Spec. App. Sept. 17, 2019). Since then, this Court has considered yet another Castruccio case: *Greiber v. Castruccio*, No. 791, Sept. Term 2018, 2019 WL 6358932 (Md. Ct. Spec. App. Nov. 27, 2019). Of the cases that this Court has considered, the Court of Appeals has affirmed our decisions in two: *Castruccio v. Estate of Castruccio*, 456 Md. 1 (2017), and *Barclay v. Castruccio*, ___ Md. ___, No. 30, Sept. Term 2019 (June 30, 2020).

third of the billed hours. The court also denied Ms. Barclay's request to apportion the fees to Mrs. Castruccio's share of the estate.

All three parties appealed the circuit court's ruling. Mrs. Castruccio challenges the court's decision to permit the attorneys' fees to be paid from the estate. The fiduciary of the estate and his attorneys contest the court's reduction of the proposed attorneys' fees. Ms. Barclay contends that the court should have found that Mrs. Castruccio acted in bad faith and, therefore, shifted the attorneys' fees to Mrs. Castruccio's share of the estate.

We affirm the circuit court's denial of Ms. Barclay's and Mrs. Castruccio's exceptions to the fee petition. We vacate the award of attorneys' fees, however, and remand the case for the court to determine an award that is consistent with this opinion.[2]

### FACTUAL AND PROCEDURAL BACKGROUND

Dr. Peter Castruccio died on February 19, 2013, and was survived by his wife of 62 years, Sadie Castruccio. The Register of Wills of Anne Arundel County admitted Dr. Castruccio's will and codicil to administrative probate on February 26, 2013, and appointed his long-time personal lawyer, John Greiber Jr., as the personal representative of the estate under the terms of the will. The inventory value of Dr. Castruccio's estate was $6,628,972.95.

After making a few cash gifts, Dr. Castruccio's will stated that Mrs. Castruccio

---

[2] We understand that Mrs. Castruccio died on March 4, 2020, after the case was argued in this Court. None of the parties informed us of Mrs. Castruccio's death, and no one has been substituted in her place in accordance with Md. Rule 8-401(b).

2

would receive the entire residuary estate if she survived him and had made and executed a will before his death. In a separate section, however, the will stated that if Mrs. Castruccio did "not have a valid Will filed with the Register of Wills in Anne Arundel County dated prior thereto these [sic]," the residuary estate would go to Darlene Barclay, Dr. Castruccio's longtime assistant.

On March 4, 2013, Mr. Greiber, the personal representative, hired Robert H.B. Cawood of the Annapolis firm of Cawood and Cawood LLC to serve as counsel to the estate. Within days thereafter, Mrs. Castruccio would initiate the first of several legal proceedings concerning Dr. Castruccio's will and the administration of estate: a petition to caveat the will.

In response to that proceeding and the likelihood of additional proceedings, Mr. Greiber promptly engaged Shale D. Stiller, Brett Ingerman, and Melissa L. Mackiewicz, attorneys at the Baltimore office of the international law firm DLA Piper LLP (US) ("DLA"), to serve as lead litigation counsel. As part of the engagement, DLA agreed to discount its standard hourly rates by 18.55 percent and not to increase the rates during the pendency of the engagement.

I.      **The Many Actions in the Administration of the Estate of Peter Castruccio**

During the years immediately following Dr. Castruccio's death, Mrs. Castruccio initiated lawsuits to contest the validity of the will, Mr. Greiber's interpretation of the will, and the administration of the estate. She also initiated another lawsuit that was designed to extract millions of dollars in assets from the estate, so that they would pass to her outside of probate. In addition, she refused to comply with a court order, which

3

prompted the estate to initiate contempt proceedings against her. These various legal proceedings led to a multitude of hearings, appeals, motions for summary judgment, a four-day trial, and extensive discovery.

## A. **The Caveat Action**

On March 12, 2013, Mr. Cawood informed Mrs. Castruccio that, under the terms of the will, she would receive the residuum of her late husband's estate only if she had had a "valid Will filed with the Register of Wills in Anne Arundel County dated prior thereto these," as the will stipulated. Mrs. Castruccio had not filed (or deposited) a will with the register of wills.[3]

On March 27, 2013, Mrs. Castruccio filed a petition to caveat in the Orphans' Court for Anne Arundel County, in which she sought to invalidate the will and obtain a declaration that Dr. Castruccio had died intestate. Mrs. Castruccio would receive the entire net estate if her late husband had died intestate. *See* Md. Code (1974, 2017 Repl. Vol., 2020 Supp.), § 3-102(f) of the Estates and Trusts Article ("ET").[4]

---

[3] Initially, the estate took the position that the phrase "dated prior thereto these" meant that Mrs. Castruccio had to have deposited a valid will with the register of wills that was dated before the date of Dr. Castruccio's 2010 will. Later, the estate modified its position to assert that Mrs. Castruccio had to have deposited a valid will with the register of wills before Dr. Castruccio's death. *See Castruccio v. Estate of Castruccio*, 239 Md. App. 345, 350 n.2 (2018). Ultimately, it makes no difference which of the interpretations is correct, because Mrs. Castruccio unquestionably had not satisfied either of them.

[4] Throughout this opinion, citations to "ET" refer to the most recent version of the Estates and Trusts Article of the Maryland Code. In 2019, the General Assembly made "stylistic" and "technical" changes to many of the provisions cited in this opinion, as part of a comprehensive recodification of the Estates and Trusts Article. *See* 2019 Md. Laws. ch. 197, preamble. The revisions were intended to be "nonsubstantive." *Id.* § 2.

During the litigation of the caveat action, the orphans' court transmitted a number of factual issues to the Circuit Court for Anne Arundel County for determination. *See* ET § 2-105(b). After extensive discovery, the circuit court granted the estate's motion for summary judgment on October 7, 2014, and rejected Mrs. Castruccio's challenge to the validity of her late husband's will. This Court affirmed the grant of summary judgment in a reported decision. *Castruccio v. Estate of Castruccio*, 230 Md. App. 118 (2016). The Court of Appeals granted Mrs. Castruccio's petition for a writ for certiorari and affirmed this Court's decision. *Castruccio v. Estate of Castruccio*, 456 Md. 1 (2017).

## B. The Deed Action

On April 13, 2013, less than three weeks after she filed the petition to caveat, Mrs. Castruccio filed an action in the Circuit Court for Anne Arundel County to quiet title to seven pieces of commercial real estate, valued at $3.6 million, that were held in the name of her late husband. Mrs. Castruccio alleged that Dr. Castruccio had forged her signature on the deeds that conveyed those properties from the Castruccios as tenants by the entireties to Dr. Castruccio alone. In effect, Mrs. Castruccio sought to extract those properties from her late husband's estate so that they would pass to her as the surviving tenant. If she were to succeed, the estate would lose more than half of its value.

After fourteen months of contentious discovery and four days of trial, the circuit court entered judgment in favor of the estate on all counts. In reaching its decision, the court stated that Mrs. Castruccio was "a particularly poor litigant to pursue this claim since she participated in the transaction by giving her assent and approval to it." Indeed, the court observed that, at about the same time that Dr. Castruccio signed his wife's name

5

to the deeds that conveyed seven jointly-held properties to himself, he also signed her name to deeds that conveyed four jointly-held properties, of roughly equal value, to her alone. The court surmised that the conveyances were part of a plan to divide the couple's assets for tax and estate-planning purposes.

This Court affirmed the circuit court's judgment, and the Court of Appeals denied Mrs. Castruccio's petition for a writ of certiorari. *See Castruccio v. Estate of Castruccio*, No. 2622, Sept. Term 2014, 2015 WL 9306895 (Md. Ct. Spec. App. Dec. 22, 2015), *cert. denied*, 447 Md. 298 (2016).

## C. **The First Removal Action**

On May 14, 2013, about seven weeks after she filed the petition to caveat and a month after she filed the deed action, Mrs. Castruccio filed a petition in the orphans' court to remove Mr. Greiber as special administrator of the estate.[5] In response to the estate's efforts to obtain discovery, Mrs. Castruccio denied access to Dr. Castruccio's records and objected to every third-party subpoena that the estate served.

At a hearing on July 11, 2013, Mrs. Castruccio voluntarily withdrew the petition after the orphans' court excluded her expert witness as a discovery sanction. The orphans' court denied the petition for removal on July 16, 2013.

---

[5] The petition to caveat had "the effect of a request for judicial probate." *See* ET § 5-207(b)(1). By operation of law, Mr. Greiber became the special administrator of the estate after Mrs. Castruccio filed her caveat action. *See* ET § 6-307(a)(1) (appointment as personal representative ends upon filing of timely petition for judicial probate); ET § 6-401(a) (authorizing the appointment of a special administrator upon the termination of the appointment of a personal representative).

**D. The Will Construction Action**

Although Mrs. Castruccio contended that her husband's will was invalid, she filed another circuit court action on January 16, 2014, in which she sought a declaration that she (rather than Ms. Barclay) was the residuary beneficiary under the will. The circuit court stayed the action on May 8, 2014, pending the outcome of the caveat action, because it made little sense to interpret the will while its validity was being challenged.

The court lifted the stay in June 2015, after its ruling in the caveat action, and the parties proceeded to conduct discovery and to file cross-motions for summary judgment. On January 6, 2017, the court granted the estate's motion for summary judgment, denied Mrs. Castruccio's cross-motion for summary judgment, and declared that Ms. Barclay was the residuary beneficiary under the will. This Court affirmed the circuit court's judgment, and the Court of Appeals denied Mrs. Castruccio's petition for a writ of certiorari. *See Castruccio v. Estate of Castruccio*, 239 Md. App. 345 (2018), *cert. denied*, 463 Md. 149 (2019).

**E. The "Emergency" Second Removal Action**

On April 22, 2014, less than a year after her defeat in the first removal action, Mrs. Castruccio filed an "emergency" second petition in the orphans' court to remove Mr. Greiber as special administrator. Mrs. Castruccio asked the orphans' court to transmit the petition to the circuit court, but the orphans' court refused.

Mrs. Castruccio appealed that decision to the circuit court and argued that her appeal divested the orphans' court of jurisdiction to hear her petition. When the orphans' court directed the hearing to proceed as scheduled despite the appeal, Mrs. Castruccio

7

refused to participate. Consequently, the orphans' court denied the petition on August 26, 2014. In addition, the orphans' court ordered Mrs. Castruccio to pay the costs and attorneys' fees that the estate incurred in opposing "the frivolous emergency petition."

On January 9, 2015, in Mrs. Castruccio's de novo appeal, the circuit court granted the estate's motion for summary judgment and ordered Mrs. Castruccio and her attorneys to pay the estate's attorneys' fees. On May 1, 2015, however, the circuit court amended its order to exclude the award of attorneys' fees. The court expressed some concern about the fees ("this is just getting out of whack, this whole case with attorney's fees"), but it appears to have decided not to award fees in this case because it had already decided to award them in yet another case – the contempt action, discussed below.[6] Both sides appealed, and this Court affirmed the circuit court's amended judgment. *Estate of Castruccio v. Castruccio*, No. 623, Sept. Term 2015, 2017 WL 2953963 (Md. Ct. Spec. App. July 11, 2017).

### F. **The Contempt Action**

In the months after Dr. Castruccio's death, Mrs. Castruccio interfered with Mr. Greiber's ability to comply with his statutory right and obligation to "take possession or control of the estate of the decedent" (*see* ET § 7-102(a)) by denying him access to Dr. Castruccio's office and records. In response, the estate moved for an order requiring Mrs. Castruccio and her counsel to give the estate and its counsel access to Dr. Castruccio's properties and records. The orphans' court granted the motion on July 16,

---

[6] "And they'll be [sic] no attorney's fees in this case because we have it in the other case," the court said.

8

2013.

When Mrs. Castruccio and her counsel failed to comply with the order, the estate filed a petition for an order requiring her and her counsel to show cause why the court should not hold them in contempt. On July 3, 2014, the orphans' court found that Mrs. Castruccio had willfully violated the order, held her in civil contempt, and ordered her to pay all of the costs and attorneys' fees that the estate had incurred in prosecuting the contempt action.

Mrs. Castruccio filed a de novo appeal to the circuit court, which also held Mrs. Castruccio in civil contempt and ordered her to pay the estate's costs under Md. Rule 1-341 and Md. Rule 6-141. On further appeal, however, this Court vacated the circuit court's decision, because the order lacked an appropriate purge provision, and because the court did not make the required findings to support the attorneys' fee award. *See Castruccio v. Estate of Castruccio*, No. 862, Sept. Term 2015, 2016 WL 7496178 (Md. Ct. Spec. App. Dec. 20, 2016). Nonetheless, this Court remarked that our decision did not "suggest that [Mrs. Castruccio] was not, in fact, in contempt." *Id.* at *8. "[T]he errors . . . [lay] in the absence of written findings and in the structure of the sanction, not in the decision to find [Mrs. Castruccio] in contempt." *Id.*[7]

---

[7] On remand, the circuit court found Mrs. Castruccio in constructive civil contempt and set a "fine" of $10,000.00. In addition, the court granted the estate's request for attorneys' fees for prosecuting the action. On appeal, however, this Court vacated the contempt finding and the fee award and remanded the case for further proceedings because the circuit court did not hold an evidentiary hearing to determine whether Mrs. Castruccio "willfully" violated the access order. *See Castruccio v. Estate of Castruccio*, No. 1651, Sept. Term 2017, 2019 WL 626172, at *10 (Md. Ct. Spec. App. Feb. 14, 2019).

### G. The Settlement Attempts

The undisputed facts in the record disclose that the estate made several attempts to avoid the costs of litigation by settling Mrs. Castruccio's claims. The attempts failed because of Mrs. Castruccio's unwillingness to settle.

On September 9, 2013, when Mrs. Castruccio's first several actions were still in an early phase, counsel for the estate wrote to the attorneys for Ms. Barclay and Mrs. Castruccio to propose that all parties agree to stay the proceedings and begin settlement negotiations to avoid further legal fees and expenses. Ms. Barclay agreed to stay the proceedings, but Mrs. Castruccio did not respond.

In February 2014, the parties participated in court-ordered mediation, but were unable to reach an agreement. Counsel for Mrs. Castruccio refused to stay the proceedings to continue the negotiations.

In June 2014, counsel for the estate continued to initiate settlement efforts by asking the attorneys for Ms. Barclay and Mrs. Castruccio to agree to a numerical range within which the parties could negotiate. Ms. Barclay's counsel provided a range, but Mrs. Castruccio's counsel would not. Instead, he reiterated the final demand from the earlier mediation and stated that there would be no settlement.

In March 2015, the court granted the parties' joint request for a 30-day continuance to negotiate a settlement in all proceedings. Mrs. Castruccio hired new counsel, and on May 13, 2015, all parties met to negotiate. The parties made significant progress towards a resolution at the meeting. A few days later, however, Mrs. Castruccio rehired her previous counsel and decided not to proceed with any further settlement

10

discussions.

The estate continued to make settlement overtures and met with Mrs. Castruccio's counsel in July 2016, but the meeting was unproductive. The parties have not engaged in any further settlement discussions since.

## H. **The Interim Petition for Attorneys' Fees**

ET § 7-603 states that, "[w]hen a personal representative or the person nominated as personal representative defends or prosecutes a proceeding in good faith and with just cause," he or she "shall be entitled to receive necessary expenses and disbursements from the estate regardless of the outcome of the proceeding." "The compensation shall be fair and reasonable in the light of all the circumstances to be considered in fixing the fee of an attorney." ET § 7-602(b)(2).

On April 15, 2015, the estate filed its interim petition for attorneys' fees, expert witness fees, mediation fees, and out-of-pocket litigation and trial expenses in the orphans' court.[8] The petition covered the period from March 1, 2013, through March 15, 2015. The estate claimed to have incurred $1,934,061.00 in attorneys' fees and $262,421.20 in expenses during that time. Later, the estate reduced the request to

---

[8] To be precise, the petition was filed by Mr. Greiber in his capacity as personal representative and by both of the firms that represented him. For ease of reference, we shall refer to the petitioners as "the estate." In doing so, we recognize that an "estate" is technically just a collection of assets and liabilities and not a juridical entity like a corporation or an LLC. *Castruccio v. Estate of Castruccio*, 230 Md. App. 118, 124 n.3 (2016), *aff'd*, 456 Md. 1 (2017).

$1,694,275.50 in fees and $242,760.43 in expenses.[9]

Mrs. Castruccio filed exceptions to the fee petition. Among other things, she argued that Mr. Greiber, as special administrator, was required to obtain the orphans' court's approval to hire DLA, but had not done so. Consequently, she argued that DLA's fees could not be paid out of the estate.

Ms. Barclay filed an exception seeking to shift the fees to Mrs. Castruccio's elective share of the estate because of her alleged bad faith during the litigation.[10]

After hearings on the petition, the orphans' court denied both exceptions and granted the petition on December 31, 2015.

Ms. Barclay and Mrs. Castruccio filed de novo appeals of the orphans' court's order to the Circuit Court for Anne Arundel County. The circuit court held a six-day trial on the petition from January 24 to January 31, 2017. The judge who presided over the trial had had little or no direct involvement in any of the litigation concerning the estate.

At trial, the estate introduced expert testimony from Benjamin Rosenberg, a distinguished member of the Maryland bar, concerning the reasonableness of the rates that the lawyers charged and the necessity of the services that they rendered. Mr.

---

[9] On the basis of information that was apparently disclosed in discovery, the estate claimed that Mrs. Castruccio had incurred over $787,000.00 in fees through July 2, 2015. That figure included the fees billed by three of the firms that had represented Mrs. Castruccio, but did not include any additional fees that she might owe to her lead counsel.

[10] Although Ms. Barclay contended that Mrs. Castruccio had no right to any part of the estate under the will, Mrs. Castruccio, as the surviving spouse, had the right to "elect[] against the will" (*Green v. Nassif*, 426 Md. 258, 281 (2012)) and to receive half of the net estate under ET § 3-203(b)(2). Ms. Barclay sought to require Mrs. Castruccio to pay the estate's fees out of her elective share.

12

Rosenberg's testimony was uncontroverted.

On June 26, 2018, the circuit court entered a memorandum opinion and order approving an interim award of attorneys' fees and expenses to be paid from the estate's assets. Reasoning that the proposed fees were only "partially fair, reasonable, and necessary," the court approved fees in the total amount of $785,370.00: $215,635.00 for Cawood & Cawood and $569,735.00 for DLA. The court further approved trial expenses in the total amount of $214,028.14: $127.50 to be paid to Cawood & Cawood and $213,900.64 to DLA. In total, the court approved less than 50 percent of the requested fees and about 80 percent of the requested expenses.

The circuit court explained its reasoning for the award in a lengthy memorandum opinion.

In that memorandum, the court first addressed Mrs. Castruccio's argument that, as a special administrator, Mr. Greiber needed court approval before hiring DLA as counsel for the estate. The court determined that Mr. Greiber had the authority to hire counsel to defend against litigation under the special administrator's power "to collect, manage, and preserve" the estate's property (*see* ET § 6-403(b)(2)) and, therefore, did not require court approval.

The court rejected Ms. Barclay's claim of Mrs. Castruccio's bad faith and found that Mrs. Castruccio's several lawsuits were not meritless.

The court further found that the estate had generally acted in good faith and with just cause, as required by ET § 7-603, in defending against Mrs. Castruccio's actions. The court found, however, that the estate was not justified in pursuing attorneys' fees

13

from Mrs. Castruccio and her lawyers in the second removal action. The court also found that the estate had not benefitted from the unsuccessful prosecution of the contempt action.[11] Accordingly, the court held that it would deny any fees requested for that action. The court omitted to note, however, that the estate sought no fees in connection with the contempt action.

The circuit court proceeded to discuss whether the fees requested by the estate were fair, reasonable, and necessary.

The court first considered the hourly rates charged by each of the estate's attorneys. On the basis of its asserted knowledge of the rates commonly charged in Anne Arundel County, the court determined that Mr. Cawood's rate ($350.00 per hour) was reasonable, but that the rates charged by the DLA attorneys were excessive.[12] Consequently, the court reduced the average rate charged by the DLA lawyers and paralegals. Most notably, the court reduced the rate charged by Mr. Stiller from $750.00 per hour to $450.00 per hour, reduced the rate charged by Mr. Ingerman from $725.00 per hour to $350.00 per hour, and reduced the rate charged by Ms. Mackiewicz from $500.00 per hour to $350.00 per hour.

---

[11] In this regard, the court asserted that the estate's lawyers "knew or should have known" that the court's own rulings were "not sustainable" and "predictably" would be "reversed by the Court of Special Appeals."

[12] The court had information concerning the fees charged by most of the many lawyers who had represented Mrs. Castruccio. One, a former circuit court judge, billed at the rate of $400.00 per hour; another, a prominent estates and trusts practitioner, billed at the rate of $375.00 per hour. The court had no information about the billing rate of Mrs. Castruccio's lead counsel.

The circuit court then considered the reasonableness of the hours billed and expenses charged for each action.

For the caveat and will construction actions, the court determined that all of the time expended (507.5 billed hours) was reasonable and necessary. Consequently, the court approved the requested fees, albeit at the reduced rates that it had imposed.

By contrast, for the deed action, which involved the most work on behalf of the estate, the court found that the attorneys had billed an excessive amount of time. Although the court recognized that the estate had "secured a favorable result," it took issue with the amount of time spent on an unsuccessful motion for summary judgment and on motions in limine, most of which had been denied. In addition, the court remarked that the "level of adversity between counsel" contributed to "excessive" billing in matters of discovery. The court seems to have envisioned that Mr. Cawood should have functioned as lead counsel in the deed action and that DLA's role should have been limited to "providing support" to him. On these bases, the court reduced the total number of hours billed from 2067.1 to 1284.1. It approved the reduced number of hours at the reduced rates that it had imposed.

On the premise that Mr. Cawood was capable of handling the first removal action by himself, the court eliminated all of the time billed by Mr. Ingerman (38.7 hours) and almost half the time billed by Ms. Mackiewicz (allowing 38.7 of the 73.4 hours billed). The court criticized the lawyers for exchanging over 19,000 documents in discovery and for identifying witnesses and exhibits that, it said, they "apparently" did not use. Additionally, the court complained that three lawyers attended the hearing at which Mrs.

15

Castruccio sought to remove Mr. Greiber. The court did not note that the lawyers' pretrial preparation led to Mrs. Castruccio's capitulation, after the orphans' court excluded her expert witness as a sanction for her discovery abuses.

For the second removal action in the orphans' court, the court proceeded again on the premise that Mr. Cawood was largely capable of handling the proceeding on his own. Consequently, the court eliminated 15 of the 40 hours billed by Ms. Mackiewicz, calling them unreasonable, unnecessary, and duplicative. For Mrs. Castruccio's two appeals of the second removal action, the court found that the estate spent too much time attempting to obtain and preserve the award of attorneys' fees against Mrs. Castruccio and her counsel. For that reason, the court denied all 164.8 hours billed by DLA and awarded only 20 (of the 34.4) hours billed by Mr. Cawood.[13]

Lastly, the court considered hours in the attorneys' bills that it could not "identify as to relating to specific matters." The court approved 426.9 of the 534.9 billed hours without providing an explanation for its decision.[14]

In total, the court approved only $785,370.00 of the $1,694,275.50 in fees requested by the estate. The court also approved only $214,028.14 of the $262,421.20 in expenses requested by the estate.

---

[13] As it did earlier in its opinion, the court faulted the estate's lawyers for defending the court's own rulings and failing to foresee that those rulings would not stand up on appeal.

[14] Though the court listed the total approved hours as 226.9, the court's calculation of the approved hours for each attorney shows that it approved 426.9 hours.

16

The estate and Ms. Barclay noted timely appeals. Mrs. Castruccio noted a timely cross-appeal.

## QUESTIONS PRESENTED

The parties present several questions, which we have consolidated and rephrased for brevity.[15]

In Mrs. Castruccio's cross-appeal, she asks the following questions:

I.   Did the court err in concluding that Mr. Greiber as special administrator of the estate had the authority to hire counsel to represent the estate?

II.  Was the estate's petition for attorneys' fees deficient because it did not estimate the fees to be requested in the future?

III. Did the court err in awarding attorneys' fees for the estate's participation in the will construction action?

In the estate's appeal, it asks the following questions:

I.   Did the court err in reducing the estate's attorneys' hourly rates because they were inconsistent with the customary fees charged for similar services in Anne Arundel County?

II.  Did the court abuse its discretion in significantly reducing the hours billed by the attorneys for the estate?

In Ms. Barclay's appeal, she asks the following questions:

I.   Did the court fail to apply the correct legal standard to her request to shift the legal fees to Mrs. Castruccio's share of the estate?

II.  Did the court err in finding that Mrs. Castruccio did not act in bad faith during the litigation?

III. Did the court err by excluding testimony regarding statements that Mrs. Castruccio made during a settlement negotiation?

---

[15] The parties' full questions are reproduced in Appendix A.

For the reasons stated in this opinion, we shall hold that the circuit court did not err or abuse its discretion in denying Mrs. Castruccio's exceptions or Ms. Barclay's exceptions to the fee petition. We shall also hold, however, that the court abused its discretion in determining the appropriate award of attorneys' fees and expenses that may be paid from the assets of the estate. Consequently, we shall affirm the judgment in part, vacate it in part, and remand the case for further proceedings consistent with this opinion.

## DISCUSSION

This discussion shall first address Mrs. Castruccio's cross-appeal of the circuit court's decision to award attorneys' fees for DLA's work. We shall then discuss the estate's appeal of the circuit court's calculation of the fee award. Lastly, we shall address Ms. Barclay's appeal of the court's refusal to apportion the attorneys' fees to Mrs. Castruccio's share of the estate.

### I.      Entitlement to Attorneys' Fees from the Estate

Mrs. Castruccio asserts three bases on which, she says, the court erred in awarding any fees for DLA's work. First, she contends that Mr. Greiber needed court approval to hire DLA as the estate's counsel because he was a special administrator, and not the personal representative. Next, she argues that the petition for fees was legally deficient because it did not estimate the fees that the law firms would request in the future. Third, she claims that the circuit court improperly allowed fees for work that did not benefit the estate. For the reasons discussed herein, we reject these arguments.

18

## A. The Special Administrator's Power to Hire Counsel Without Court Approval

On March 27, 2013, Mrs. Castruccio filed a petition for caveat. Consequently, Mr. Greiber's status changed from personal representative to special administrator of the estate under ET § 6-307.[16] Although Mr. Greiber repeatedly requested the orphans' court's approval of his decision to engage DLA, the orphans' court never formally acted on those requests.

It has long been understood that the fiduciary of an estate may engage counsel without court approval. *See*, *e.g.*, *Ward v. Koenig*, 106 Md. 433, 437 (1907); *see also Piper Rudnick LLP v. Hartz*, 386 Md. 201, 237 (2005) (holding that a personal representative had the authority to engage counsel under the testator's will and under ET § 7-401(a), which permits a personal representative to "exercise all of the power or authority conferred upon the personal representative by statute or in the will, without application to, the approval of, or ratification by the court"). Under Dr. Castruccio's will, Mr. Greiber was "authorized to enforce, compromise and/or litigate any claim against or in favor" of the estate, which presumably includes the power to engage counsel to achieve those ends.

Nonetheless, Mrs. Castruccio contends that, once Mr. Greiber was transformed into a special administrator by the filing of the petition to caveat, he had no power to

---

[16] Under ET § 6-307(b), "[s]ubject to an order in the proceeding for judicial probate, a personal representative appointed previously has the powers and duties of a special administrator until the appointment of a personal representative in the judicial probate proceeding."

engage DLA without the orphans' court's approval. For that reason, she contends, the court could not authorize the payment of DLA's fees from the assets of the estate.

Mrs. Castruccio bases her argument on ET § 6-403(b), which states that a special administrator "(1) Shall assume all duties unperformed by a personal representative imposed under Title 7, Subtitles 2, 3, and 5 of this article; and (2) Has all powers necessary to collect, manage, and preserve property." Other powers may be "designated from time to time by court order." ET § 6-403(c).

Mrs. Castruccio observes that Subtitle 4 of Title 7 of the Estates and Trusts Article gives a personal representative the power to prosecute or defend actions, claims, or proceedings. *See* ET § 7-401(y). On the premise that a special representative assumes only the "duties unperformed by a personal representative imposed under Title 7, Subtitles 2, 3, and 5," Mrs. Castruccio asserts that a special representative has no powers other than those granted in Subtitles 2, 3, and 5. Because the power to prosecute or defend actions, claims, or proceedings is granted in Subtitle 4, Mrs. Castruccio concludes that Mr. Greiber, as special administrator, would possess that power only if the orphans' court granted it to him, which it did not.

Mrs. Castruccio's argument conflates "duties" and "powers." A "duty" is an action that special administrators are *required* to perform as part of their role. *See* Duty, BLACK'S LAW DICTIONARY (11th ed. 2019) ("[a] legal obligation that is owed or due to another and that needs to be satisfied; that which one is bound to do, and for which somebody else has a corresponding right"). A "power" is an action that special administrators *may* perform as part of their role. *See* Power, BLACK'S LAW DICTIONARY

20

(11th ed. 2019) ("[t]he legal right or authorization to act or not act"). Under ET § 6-403(b), special administrators assume the personal representative's unperformed duties under Subtitles 2, 3, and 5 and have the powers necessary to collect, manage, and preserve property.

Therefore, although ET § 6-403(b)(1) imposes the duties conferred in Subtitles 2, 3, and 5 of Title 7 on the special administrator, it does not limit the special administrator's powers to those granted in those three subtitles. Under the power to "collect, manage, and preserve property," granted in § 6-403(b)(2), a special administrator may prosecute and defend litigation on behalf of the estate. It follows that a special administrator may engage counsel to prosecute and defend litigation on behalf of the estate, without court approval.[17]

The legislative history of the statute further indicates that § 6-403 does not limit the powers of a special administrator. The original version of the statute, which was enacted in 1974, stated: "A special administrator has all powers necessary to collect,

---

[17] In advocating a contrary conclusion, Mrs. Castruccio relies on what she admits is dicta in *Banashak v. Wittstadt*, 167 Md. App. 627, 653 (2006). In that case, this Court cited ET § 6-403(b) for the proposition that "the conferring of duties and powers on the special administrator is confined to those spelled out in Subtitles 2, 3, and 5 of Title 7 and does not include those conferred by Subtitle 4," including the power to prosecute and defend litigation. Accordingly, this Court suggested that, "to engage in litigation and . . . to incur legal fees to that end," a special representative must "rely on the granting of 'other powers designated from time to time by court order' pursuant to § 6-403." *Id.* This Court's statements were incorrect, because § 6-403 does not limit a special administrator's powers to those contained in Subtitles 2, 3, and 5 of Title 7 of the Estates and Trusts Article. The incorrect statements were, however, unnecessary to the decision, because the case holds only that the appeal was premature and therefore that this Court had no appellate jurisdiction. *Id.* at 659.

21

manage and preserve property." 1974 Md. Laws ch. 11, at 108. In 1980, the General

Assembly amended the statute by adding the language that the special administrator

"shall assume all duties unperformed by a personal representative imposed under

Subtitles 2, 3, and 5 of Title 7." 1980 Md. Laws ch. 42, at 757. This amendment affected

only the "duties" of the special administrator, as the language concerning the "powers"

was left unchanged.

In a letter in support of the 1980 amendment, the Estate and Trust Law Section of

the Maryland State Bar Association stated that the amendment would "simply require[]"

the special administrator to carry out duties imposed onto a personal representative under

Subtitles 2, 3, and 5, such as filing inventories and notices, but "[i]n all other respects,

Section 6-403 *would remain unchanged*." *See* Letter from Earl S. Wellschlager, to

Senator J. Joseph Curran, Jr., dated Oct. 9, 1979 (emphasis added).[18] The letter explains

that the amendment was necessary because "existing law [did] not impose upon the

special administrator any duty to account for the property of the estate . . . or to carry out

any unperformed duties of a personal representative." *Id.*

---

[18] The letter indicates that the Estate and Trust Section drafted the legislation and provided it to Senator Curran, the chairman of the Senate Judicial Proceedings Committee, who sponsored the bill as SB 88. According to the bill's legislative history, the author of the letter was the only witness to testify about the bill in front of the Judicial Proceedings Committee. A copy of the letter is attached to this opinion as Appendix B.

22

Section 6-403, accordingly, does not limit the powers of a special administrator, as Mrs. Castruccio contends. The circuit court, therefore, did not err in determining that Mr. Greiber had the authority to hire counsel for the estate litigation without court approval.[19]

### B. **The Sufficiency of the Petition for Attorneys' Fees**

Maryland Rule 6-416(a)(1)(B) mandates that a petition for attorneys' fees state "the amount of fees or commissions that the petitioner reasonably estimates will be requested in the future." In its petition, however, the estate declined to make an estimate of future fees, stating that it could not, at that time, "identify the amount of fees or commissions it reasonably estimates will be requested in the future." The petition cited the many matters decided by or pending before the orphans' court at the time and the several appeals that Mrs. Castruccio initiated on those matters.

Mrs. Castruccio argues that the petition for attorneys' fees was deficient because it did not estimate the fees that the estate would request in the future. In view of that omission, she argues that Mr. Greiber has forfeited the right to use the estate's assets to pay his attorneys' fees. In the unusual circumstances of this case, we conclude that the estate substantially complied with Rule 6-416(a)(1)(B) when it explained its inability to make a reliable, good faith estimate of future fees.

On April 16, 2015, when the estate filed the fee petition, Mrs. Castruccio had appeals pending in no fewer than four separate proceedings: the caveat action, the deed

---

[19] Even if the special administrator was obligated to obtain the orphans' court's approval to engage DLA, which he was not, one could infer that the orphans' court approved the engagement, *nunc pro tunc*, when it approved a petition to pay over a million dollars in fees to DLA.

action, the contempt action, and the second removal action. Meanwhile, the will construction action had been stayed, but would spring back to life if the appellate courts affirmed the entry of summary judgment against Mrs. Castruccio in the caveat action (as they eventually did). Hence, to estimate the future fees at the time when Mr. Greiber filed the fee petition, he would have had to forecast the cost of defending four appeals, including the potential costs if the Court of Appeals granted certiorari in one or more of them. He would also have had to account for the possibility of reversal in one or more of the appeals, as well as the possibility of additional costs in the event of remand. Finally, he would have had to predict the cost of pursuing the will construction action, through discovery and a potential trial, as well as two potential levels of appeal.

In view of the array of uncertainties that lay before them at the time, it is unsurprising that Mr. Greiber and his attorneys confessed their inability to make a meaningful estimate of the future fees. An estimate would have been little more than a guess.

In theory, the estate could have waited until all of the litigation was finally over before petitioning for fees. In that case, the estate would not have been required to make an estimate of future fees. The attorneys, however, would have to work for an indeterminate amount of time (it has now been more than seven years) without compensation. In our view, it would be unreasonable to require the estate to follow that course.

This is not an ordinary case in which the fiduciary of an estate engages counsel to perform a discrete task – e.g., to defend against a creditor's claim (*Wright v. Nuttle*, 267

24

Md. 698, 699-700 (1973)), to defend a caveat action alleging undue influence (*Fields v. Mersack*, 83 Md. App. 649, 651-52 (1990)), or to foreclose on a mortgage (*Ward v. Koenig*, 106 Md. at 434). This case involves a welter of complex and interrelated litigation. It is often difficult to predict what will occur in any litigation, and those difficulties were multiplied many times in this engagement.

"The law, in its majesty, is not designed to require futile action or idle gestures." *Clark v. Wolman*, 243 Md. 597, 600 (1966). Where the fiduciary of a decedent's estate cannot make a reasonable, good faith estimate of the likely future fees, as it is in this unusual case, it is futile to require one to be made. For that reason, we conclude that the circuit court did not err in awarding fees in this case despite the absence of an estimate of future fees.

### C. <u>The Fees Incurred in the Will Construction Action Are Compensable</u>

Citing *Mudge v. Mudge*, 155 Md. 1, 3-4 (1928), Mrs. Castruccio argues that a court may authorize the payment of attorneys' fees out of the assets of an estate only for work that is "beneficial to the estate, either by the enlargement or the protection of it, and not where the only question to be decided is to whom the estate, or any part of it, shall go and in what proportions." Mrs. Castruccio argues that Mr. Greiber's participation in the will construction action did not benefit the estate. Instead, she argues that his participation simply benefitted one claimant (Ms. Barclay) at the expense of another (her), by deciding which of them was the residuary beneficiary. Hence, she concludes that under *Mudge v. Mudge* the court could not properly award any fees for work done in connection with the will construction action.

25

*Mudge v. Mudge* is not good law. In *Piper Rudnick LLC v. Hartz*, 386 Md. at 217, the Court of Appeals held that "there is no statutory *independent* or *separate* requirement contained within [ET] § 7-603 that the personal representative benefit the estate" before a court may allow the payment of attorneys' fees out of the assets of the estate. *See also id.* at 218 (stating that ET § 7-603 "does not include an independent 'benefit to the estate' requirement"); *id.* at 228 (stating that "there is no 'for the protection or benefit of the estate' requirement in [ET] § 7-603"). ET § 7-603, which was enacted after *Mudge*, contains only two conditions: "(1) the defense or prosecution must be 'in good faith and with just cause,' and (2) the expenses and disbursements must be 'necessary.'" *Piper Rudnick LLC v. Hartz*, 386 Md. at 218.

"[W]hile § 7-603 does not contain an independent 'benefit to the estate' requirement, that concept is a factor to be considered in the objective inquiry into whether the personal representative acted in good faith and with just cause." *Id.* at 232. "The concept of benefit to the estate is," however, "not limited to monetary benefits." *Id.* at 233. "A personal representative acts to benefit the estate when he or she seeks to effectuate the testator's intent." *Id.* at 233-34. Thus, for example, the Court of Appeals upheld the award of attorneys' fees, from the assets of the estate, for the successful defense against an action to remove the personal representative. *Id.* at 236. In those circumstances, "[t]he personal representative is not acting out of personal interest, but rather is acting to benefit of the estate" by effectuating the testator's intent as to who the fiduciary of the estate should be. *Id*.

26

Similarly, the fiduciary of an estate seeking to "effectuate the testator's intent" when defending against challenges to the fiduciary's reasonable, good faith construction of the will. Though Maryland has not yet expressly acknowledged this principle, other state courts widely hold that a personal representative who participates in a will construction action is acting to benefit the estate and is entitled to attorneys' fees. *See In re Estate of Thorp*, 669 N.E.2d 359, 364-65 (Ill. App. Ct. 1996) (upholding award of attorneys' fees to the attorney who had represented the executrix of an estate in an action by the executrix to construe an ambiguous will); *In re Succession of Bernat*, 76 So.3d 1287, 1292 (La. Ct. App. 2011) (holding that a fiduciary has a duty to defend the validity of the testator's will and that the costs incurred in a will contest should be paid out of the estate); *In re Estate of Torgersen*, 711 N.W.2d 545, 555 (Minn. Ct. App. 2006) (recognizing that "an estate as an entity is benefited when genuine controversies as to the validity or construction of a will are litigated and finally determined"); *Humane Soc'y of Austin & Travis Cty. v. Austin Nat'l Bank*, 531 S.W.2d 574, 581 (Tex. 1975) (holding that the executor had a duty to determine the testatrix's intent in order to appropriately distribute the estate assets and, therefore, the executor was entitled to attorneys' fees paid from the estate); *see also* 2 Robert L. Rossi, *Attorneys' Fees* § 11:56 (3d ed. 2019); 80 Am. Jur. 2d Wills § 1271 (2019).

As personal representative, Mr. Greiber acted to effectuate Dr. Castruccio's testamentary intent by defending against Mrs. Castruccio's challenge to the construction of the will. Mr. Greiber, therefore, acted "in good faith and with just cause" in that

27

matter.  Accordingly, the circuit court correctly awarded the payment of attorneys' fees, from the assets of the estate, for the will construction action.

## II.     The Circuit Court Erroneously Reduced the Attorneys' Fee Award

The estate disputes two aspects of the circuit court's awards of fees and expenses. First, it contends that the court impermissibly reduced the already-discounted hourly rates charged by DLA.  Second, the estate argues that the court erroneously deemed a large portion of its work unnecessary.

Appellate courts review a trial court's attorneys' fees award under the abuse of discretion standard.  *Monmouth Meadows Homeowners Ass'n, Inc. v. Hamilton*, 416 Md. 325, 332-33 (2010) (citing *Myers v. Kayhoe*, 391 Md. 188, 207 (2006)).  A court may abuse its discretion when awarding attorneys' fees if it "adopts a position that no reasonable person would accept."  *Pinnacle Grp., LLC v. Kelly*, 235 Md. App. 436, 476 (2018) (quoting *Letke Sec. Contractors, Inc. v. U.S. Sur. Co.*, 191 Md. App. 462, 474 (2010))  "[T]he trial court's determination of the [r]easonableness of [attorney's] fees is a factual determination within the sound discretion of the court, and will not be overturned unless clearly erroneous."  *Royal Inv. Grp., LLC v. Wang*, 183 Md. App. 406, 457 (2008).[20]

---

[20] A trial court has discretion to determine an appropriate fee in part because of its "superior understanding of the litigation."  *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).  In this case, however, the judge who handled the fee petition had little or no direct involvement in any of the litigation pertaining to the Castruccio estate besides the fee petition itself.  In these circumstances, one might question the extent to which a deferential abuse of discretion standard is truly appropriate to all aspects of the circuit court's decision.  On the other hand, we also "give deference to the [circuit] court because we wish to avoid protracted litigation over fees and because strict uniformity in

## A. **DLA's Hourly Rates**

The estate contests the circuit court's decision to reduce the hourly rates of most of the DLA attorneys by approximately a third. In a series of related arguments, the estate contends that the court erred or abused its discretion in allowing the estate to reimburse the attorneys only at the lower rates that the court found, in its experience, to be the "customary" rates in Anne Arundel County.

Although we disagree with many of the arguments that the estate has brought to bear, we agree that, on the record in this case, there was no basis to conclude that Mr. Greiber could have readily found an Anne Arundel County law firm with the resources and specialized experience to defend the estate against the sophisticated, multi-front legal offensive that Mrs. Castruccio was about to launch. For that reason, we conclude that the court abused its discretion in reducing DLA's already-discounted fees. Accordingly, we shall vacate the attorneys' fee award and remand the case to the circuit court for a determination of the fair and reasonable hourly rates in accordance with this opinion.

### *1. Rule 2-703*

In determining the reasonable hourly rate for the estate's various attorneys, the circuit court primarily relied on Md. Rule 19-301.5. As other Maryland courts have done, we shall refer to Rule 19-301.5 as "Rule 1.5," because it is derived from Rule 1.5

---

fee awards 'is not so compelling as to justify a high level of scrutiny.'" *Mathur v. Board of Trs. of S. Ill. Univ.*, 317 F.3d 738, 742 (7th Cir. 2003) (quoting *Miller v. Artistic Cleaners*, 153 F.3d 781, 784 (7th Cir. 1998)). Consequently, we shall assume, for purposes of this opinion, that the abuse of discretion standard applies.

29

of the American Bar Association's Model Rules of Professional Conduct. *See Brown &*

*Sturm v. Frederick Rd. Ltd. P'ship*, 137 Md. App. 150, 179 (2001).

Rule 1.5 sets forth a nonexclusive list of factors that are to be considered in

determining the reasonableness of a fee, including "the fee customarily charged in the

locality for similar legal services."[21] The circuit court placed a great deal of emphasis on

that one factor in significantly reducing DLA's fees.

The estate argues that the circuit court used the wrong rule. According to the

estate, the court should have used Md. Rule 2-703, which "applies to claims for

attorneys' fees allowable by law to a party in an action in a circuit court." *See* Md. Rule

2-703(a).

Rule 2-703(f)(3) sets forth a number of factors for a court to consider in cases in

which the rule applies. Many of these factors are common to both Rule 2-703 and Rule

1.5. Rule 2-703, however, does not require a court to consider "the fee customarily

charged in the locality for similar legal services." Instead, Rule 2-703 requires a court to

---

[21] The list of factors enumerated Rule 1.5 is:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent.

consider "the customary fee for similar legal services," without expressly tying the customary fee to the fee charged in "the locality," as Rule 1.5 does.[22]

On the premise that Rule 2-703 applies in this case, the estate concludes that the court erred in considering the fees customarily charged in Anne Arundel County. We disagree with the premise that Rule 2-703 applies.

Rule 2-703 is one of a series of rules concerning claims for attorneys' fees in Chapter 7 of Title 2 of the Maryland Rules. Those rules regulate claims for attorneys'

---

[22] The complete list of factors to be considered under Rule 2-703 is:

   (A) the time and labor required;

   (B) the novelty and difficulty of the questions;

   (C) the skill required to perform the legal service properly;

   (D) whether acceptance of the case precluded other employment by the attorney;

   (E) the customary fee for similar legal services;

   (F) whether the fee is fixed or contingent;

   (G) any time limitations imposed by the client or the circumstances;

   (H) the amount involved and the results obtained;

   (I) the experience, reputation, and ability of the attorneys;

   (J) the undesirability of the case;

   (K) the nature and length of the professional relationship with the client; and

   (L) awards in similar cases.

31

fees allowed by law, claims for attorneys' fees allowed by contract as an element of damages, and claims for attorneys' fees under a prevailing-party provision to a contract.

Subject to a number of exceptions that are inapplicable here,[23] Rule 2-703 and the other rules in that series "apply to actions in which, by law or contract, a party is entitled to claim attorneys' fees *from another party*." Md. Rule 2-702(a) (emphasis added); *see also* Md. Rule 2-703(b) (discussing the requirements of an initial pleading when a party "seeks attorneys' fees *from another party*") (emphasis added).

In this case, however, the estate does not assert the right to claim attorneys' fees from another party. Rather, the fiduciary of the estate has requested the court's permission to pay his own attorneys' fees from the assets of the estate that he administers in trust for the beneficiaries. Rule 2-703, therefore, simply does not apply in this case.

Furthermore, by its terms, Rule 2-703 applies to actions that begin in the circuit court. For example, Rule 2-703(b) addresses the contents of a circuit court pleading: "A

---

[23] The rule does not apply to claims for attorneys' fees:

(1) in an action under Code, Family Law Article where an award of attorneys' fees does not depend on the applicant's having prevailed in the action or on any particular claim or issue in the action; (2) in a proceeding under Rules 1-341 or 2-433, or any other Rule permitting an award of reasonable attorneys' fees as a sanction or remedy for the violation of a Rule or court order; (3) by an attorney for legal services rendered by the attorney to the attorney's client; or (4) in an action to foreclose a lien under Title 14 of the Maryland Rules. In determining the reasonableness of any requested fee in the proceedings enumerated in this section, the court may apply some or all of the evidentiary requirements and standards set forth in the Rules in this Chapter, as appropriate under the circumstances.

Md. Rule 2-702(b).

party who seeks attorneys' fees from another party pursuant to this Rule shall include a claim for such fees in the party's initial pleading or, if the grounds for such a claim arise after the initial pleading is filed, in an amended pleading filed promptly after the grounds for the claim arose." In addition, Rule 2-703(c) requires the court to issue a scheduling order that discusses, among other things, whether the claim for attorneys' fees should be bifurcated from the merits and whether "any award of attorneys' fees will be included in the judgment entered on the underlying cause of action or as a separate judgment." None of those considerations apply to this case, because it did not begin in the circuit court, but arrived there by way of a de novo appeal from the orphans' court.

In short, Rule 2-703 did not govern the estate's interim petition for attorneys' fees. Consequently, the circuit court did not err in not employing the factors listed in Rule 2-703 to evaluate the reasonableness of the requested hourly rates.

### 2. *The Lodestar Approach*

In the alternative, the estate argues that the circuit court should have used the so-called lodestar approach, instead of Rule 1.5, to evaluate its statutory claim for attorneys' fees.

Federal and state courts apply the lodestar approach to claims for attorneys' fees under fee-shifting statutes,[24] which "'are usually designed to encourage suits that, in the judgment of the legislature, will further public policy goals.'" *Monmouth Meadows Homeowners Ass'n, Inc. v. Hamilton*, 416 Md. at 334 (quoting *State v. Native Vill. of*

---

[24] *See Friolo v. Frankel*, 373 Md. 501, 521-27 (2003).

*Nunapitchuk*, 156 P.3d 389, 403 (Alaska 2007)). "A court's application of the lodestar method in these cases 'is designed to reward counsel for undertaking socially beneficial litigation in cases where the expected relief has a small enough monetary value that [other methods] would provide inadequate compensation.'" *Id.* at 334-35 (quoting *Krell v. Prudential Life Ins. Co. of Am.*, 148 F.3d 283, 333 (3d Cir. 1998)). In actions under fee-shifting statutes under Maryland law, "the lodestar approach is ordinarily the appropriate one to use in determining a reasonable counsel fee." *Friolo v. Frankel*, 373 Md. 501, 505 (2003).[25]

The lodestar approach contains two steps. First, the court multiplies the number of hours expended on the litigation by a reasonable hourly rate. *Friolo v. Frankel*, 373 Md. at 523. Second, the court considers several factors that might lead to an upward or downward adjustment of the fee (*id.* at 524), including the customary fee for similar work in the community.[26] An "important factor" in the analysis is the "results obtained." *Id.*

---

[25] Maryland appellate courts have held that the lodestar method applies to the following fee-shifting statutes: the Maryland Wage and Hour Law, Md. Code (1991, 2008 Repl. Vol.); § 3-427 of the Labor and Employment Article ("LE") (*Friolo v. Frankel*, 373 Md. at 529); the Maryland Wage Payment and Collection Law, LE § 3-507.1 (*Pinnacle Grp., LLC v. Kelly*, 235 Md. App. 436, 478 (2018)); the Maryland Automotive Warranty Enforcement Act, Md. Code (1975, 2013 Repl. Vol.), § 14-1502 of the Commercial Law Article ("CL") (*Hyundai Motor Am. v. Alley*, 183 Md. App. 261, 277 (2008)); and the Consumer Protection Act, CL § 13-408 (*Hyundai Motor Am. v. Alley*, 183 Md. App. at 277). For a list of Maryland's policy-driven, fee-shifting statutes, see John Henderson, *Attorney's Fees*, in MARYLAND EMPLOYMENT LAW DESKBOOK 935 (Maryland State Bar Ass'n 2016).

[26] The lodestar factors include:

(1) the time and labor required (the judge should weigh the hours claimed against his or her own knowledge, experience, and expertise and, if more

When a party "has obtained 'excellent results,' the attorney should recover 'a fully compensatory fee.'" *Id.* at 525-26 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983)).

Both the lodestar method and Rule 1.5 employ similar factors. *Monmouth Meadows Homeowners Ass'n, Inc. v. Hamilton*, 416 Md. at 337 (stating that "there is likely to be some overlap between the Rule 1.5 factors and the mitigating factors typically considered in a lodestar analysis"); *Friolo v. Frankel*, 373 Md. at 527 (stating that "most" of the factors under Rule 1.5 are "identical or similar" to the lodestar factors).

Nonetheless, the two methods differ in one significant respect: the lodestar method "may very well return a fee award that is actually larger than the amount in controversy" (*Monmouth Meadows Homeowners Ass'n, Inc. v. Hamilton*, 416 Md. at 334), while "Rule

---

than one attorney is involved, scrutinize the possibility of duplication); (2) the novelty and difficulty of the questions (cases of first impression generally require more time and effort); (3) the skill required to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent (fee agreed to by client is helpful in demonstrating attorney's fee expectations, litigant should not be awarded fee greater than that he is contractually bound to pay); (7) time limitations imposed by the client or circumstances (whether this was priority work); (8) the amount involved and the results obtained (court should consider amount of damages awarded but also whether decision corrects across-the-board discrimination affecting large class of employees); (9) experience, reputation, and ability of attorneys; (10) undesirability of the case (effect on the lawyer in the community for having agreed to take an unpopular case); (11) nature and length of professional relationship with the client; and (12) awards in similar cases.

*Friolo v. Frankel*, 373 Md. at 522 n.2.

35

1.5 does not carry with it the notion that the importance of the right vindicated will justify an expenditure of attorney time that is hugely disproportionate to the dollar amount at issue in the case." *Id.* at 337. Thus, "when applying Rule 1.5, trial judges should consider the amount of the fee award in relation to the principal amount in litigation," which "may result in a downward adjustment." *Id.* "Although fee awards [under Rule 1.5] may approach or even exceed the amount at issue, the relative size of the award is something to be evaluated." *Id.* [27]

The estate argues that it asserted a statutory claim for attorneys' fees under ET § 7-603. Consequently, the estate argues that the circuit court should have applied the lodestar method. Had the court applied that method, the estate argues, it should have approved the requested fees, because it would have focused on the excellent results that the lawyers achieved and disregarded the size of the attorneys' fees as compared to the size of the estate.[28]

We disagree that the lodestar method applies to the determination of a reasonable fee under ET § 7-603. Unlike the fee-shifting statutes to which the lodestar method

---

[27] Besides the emphasis on the size of the award compared to the fee, "the only remaining difference between the two approaches is that the lodestar method includes an 'awards in similar cases' factor and an 'undesirability of the case' factor, which Rule 1.5 does not." *Congressional Hotel Corp. v. Mervis Diamond Corp.*, 200 Md. App. 489, 505 (2011).

[28] The estate originally requested attorneys' fees and expenses in the amount of $2,196,482.20. It later reduced the request to $1,988,368.43. The inventory value of the estate was $6,628,972.95. When considering the size of the requested fees, the circuit court stated that the issue in "all of these matters, was the preservation of the estate assets."

generally applies, ET § 7-603 does not permit the estate to shift its fees to its adversary. In this case, for example, ET § 7-603 did not permit the court to order Mrs. Castruccio to pay the estate's fees. Instead, ET § 7-603 permits Mr. Greiber, as the fiduciary of an estate, to request court approval to pay his own attorneys' fees from the assets that he administers in trust for the estate's beneficiaries. Where a fiduciary is seeking to shift the costs of litigation to the beneficiaries rather than to a statutorily disfavored adversary, a court should consider the amount of the requested fees in relation to the size of the estate.

Indeed, in proceedings concerning trusts and estates, courts widely consider the size of the estate in relation to the fees when awarding attorneys' fees. *See In re Estate of Johnson*, 119 P.3d 425, 433 (Alaska 2005) (stating that "[c]ourts in a number of jurisdictions have found that attorney's fees in probate matters were excessive because they were unreasonably large relative to the size of the estate"); *Matter of Crandall*, 430 P.3d 902, 925 (Kan. 2018) (stating that under a law analogous to Rule 1.5, "it was appropriate . . . to consider the amount charged compared to the value of the estate"); *Brady v. Citizens Union Sav. Bank*, 38 N.E.3d 301, 304 (Mass. App. Ct. 2015) (stating that fees are to be awarded on conservative principles "to prevent the fund from being either entirely or in great part absorbed by counsel fees"); *In re Sloan Estate*, 538 N.W.2d 47, 50 (Mich. Ct. App. 1995) (stating that, "[i]n estate matters, the probate court must review a petition for attorney fees for reasonableness with an eye toward preservation of the estate's assets for the beneficiaries"); *Matter of Estate of McCranor*, 575 N.Y.S.2d 181, 183 (App. Div. 1991) (holding that the trial court "erred in disregarding the small size of the estate, resulting in an award for legal fees in excess of 25% of the estate

37

assets"); *see also* In re Neibart Assocs. Press, Inc., 58 B.R. 212, 215 (Bankr. E.D.N.Y. 1985) (reducing a bankruptcy trustee's attorneys' fees because "the allowance of all the fees requested would require in excess of 50 percent of the debtor's estate, leaving less than that percentage for distribution to general creditors").

A proportionately high fee, however, may be justified when warranted by the complexities of the case and the size of the estate. *See In re Wood's Estate*, 379 N.E.2d 256, 262 (Ohio Ct. App. 1977) (affirming substantial attorneys' fee award because "there was evidence that a large estate was involved, . . . that there were serious and complex matters involved in the estate, and that the attorney effected tax savings in excess of the amount of the fee which he requested"). For example, in *In re Estate of Ziechmann*, 580 N.E.2d 31, 33 (Ohio Ct. App. 1989), the court approved fees worth 40 percent of the estate after counsel successfully defended against ten actions in six years. A party shouldn't be able to complicate the management of the estate and then argue that the other side's lawyers are taking too big a share.

In summary, the lodestar method does not apply to an award of fees under ET § 7-603, because that statute does not permit the court to shift the prevailing party's attorneys' fees to its adversary in order to facilitate socially beneficial litigation in which the expected recovery may not otherwise be sufficiently large to attract private counsel. The circuit court, therefore, did not err in considering the amount of the requested fees in relation to the size of the estate as one factor in its analysis.

### 3. *The Judge's Use of His Own Personal Knowledge*

In the written opinion, the trial judge cited his "familiar[ity] with litigation practices, including reasonable hourly rates in Anne Arundel County, having practiced there for twenty (20) years before joining the Circuit Court," in finding that DLA's proposed rates were inconsistent with fees customarily charged in the area. The estate contends that the judge impermissibly relied on his own personal knowledge to calculate reasonable hourly rates for each attorney. The estate is incorrect.

Under Maryland law, a judge may "rely upon his [or her] own knowledge and experience in appraising the value of an attorney's services." *Foster v. Foster*, 33 Md. App. 73, 77 (1976); *accord Milton Co. v. Council of Unit Owners of Bentley Place Condo.*, 121 Md. App. 100, 121 (1998); *Kilsheimer v. Dewberry & Davis*, 106 Md. App. 600, 620 (1995); *Johnson v. Baker*, 84 Md. App. 521, 540 (1990); *Randolph v. Randolph*, 67 Md. App. 577, 589 (1986); *Head v. Head*, 66 Md. App. 655, 670 (1986). Because of the substantial discretion afforded to a court in setting fees, judges who hold a formal hearing, receive substantial evidence, and carefully examine the record may consider their personal knowledge and experience in determining a reasonable fee. *Foster v.*

*Foster*, 33 Md. App. at 77-78. This principle is widely followed in federal[29] and state[30] courts as well. The circuit court, therefore, did not abuse its discretion in using its own knowledge and experience in determining reasonable hourly rates.

### 4. *The "Locality" Factor and Rule 1.5*

As one factor bearing on an award of reasonable attorneys' fees, Rule 1.5(a)(3) allows courts to consider "the fee customarily charged in the locality for similar services." The circuit court found that the hourly rates charged by DLA's Baltimore office were "inconsistent with the customary fees charged for similar services in Anne Arundel County." On that basis, the court substantially reduced the rates for most of the firm's attorneys.

---

[29] *See Harrison v. Perea*, 168 U.S. 311, 325 (1897) ("in fixing [the attorneys' fee] amount, the trial court could proceed upon its own knowledge of the value of the solicitor's services"); *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 179 (4th Cir. 1994) (finding no "abuse of discretion where the magistrate judge used his own personal knowledge of the prevailing rates in [the locality]"); *Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp.*, 194 F.2d 846, 859 (8th Cir. 1952) (the allowance of attorneys' fees "may be made, based upon the record and the expert knowledge possessed by the judges of either trial or appellate courts, without any specific testimony with reference to the value of the services"). *But see League of United Latin Am. Citizens v. Roscoe Indep. Sch. Dist.*, 119 F.3d 1228, 1234 (5th Cir. 1997) (stating that "[t]he hourly fee awarded must be supported by the record; the district court may not simply rely on its own experience in the relevant legal market to set a reasonable hourly billing rate").

[30] *See Cooley v. Cooley*, 231 So.2d 915, 917 (Ala. Civ. App. 1970) ("[t]he court is presumed to have knowledge, even without evidence, from which it may set [an attorneys'] fee"); *Johnson v. Westhoff Sand Co., Inc.*, 135 P.3d 1127, 1135 (Kan. 2006) (holding that a trial court is an expert on the issue of attorneys' fees and may apply its own knowledge and professional experience in determining the value of the services rendered); *Jordan v. Freeman*, 336 N.Y.S.2d 671, 672 (App. Div. 1972) (holding that a court "may consider its own knowledge and experience concerning reasonable and proper fees and in the light of such knowledge and experience," determine the reasonable value of attorneys' fees).

The estate argues that, even if Rule 1.5 is the pertinent rule, the court erroneously stressed the "locality" factor at the expense of other relevant factors. It reasons that the proposed hourly rates were justified by the need for counsel who were experienced in complex litigation involving large estates and by the need for additional staffing to respond to the onslaught of litigation that Mrs. Castruccio was expected to unleash.

"The relevant market for determining the prevailing rate is ordinarily the community in which the court where the action is prosecuted sits." *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994). Thus, federal courts generally begin by examining rates in the judicial district in which the court sits. *See Barjon v. Dalton*, 132 F.3d 496, 500-01 (9th Cir. 1997) (finding no error in applying hourly rate in accordance with prevailing rates in local forum – the Sacramento area – rather than the higher rates charged by San Francisco attorneys); *Jane L. v. Bangerter*, 61 F.3d 1505, 1510 (10th Cir. 1995) (holding that the Utah district court correctly applied average hourly rates in Salt Lake City in awarding fees to New York City attorneys rather than higher New York City rates); 1 Robert L. Rossi, *Attorneys' Fees* § 5:5 (3d ed. 2019). The circuit court was generally correct, therefore, that the "locality" in this case is Anne Arundel County.

Courts, however, permit out-of-forum counsel to charge higher rates than those customary in their own locality in certain circumstances, such as when local counsel with the necessary expertise is unavailable, when the complexity of the case warrants the higher rates charged by attorneys who concentrate in a specialized area of the law, or when local counsel is unwilling to take a case. *See Interfaith Cmty. Org. v. Honeywell*

41

*Int'l, Inc.*, 726 F.3d 403, 413-14 (3d Cir. 2013) (permitting counsel to charge Washington, D.C., rates when no local northern New Jersey attorneys were willing to handle complex environmental litigation); *Nat'l Wildlife Fed'n v. Hanson*, 859 F.2d 313, 317-18 (4th Cir. 1988) (permitting counsel to charge Washington, D.C., rates in Raleigh, North Carolina, when "the nearest counsel with the requisite expertise in complex environmental litigation and the willingness to forgo compensation temporarily and perhaps permanently" was in Washington). Courts will permit out-of-forum rates if "a reasonable client would have selected out-of-district counsel because doing so would likely . . . produce a substantially better net result." *Restivo v. Hessemann*, 846 F.3d 547, 590 (2d Cir. 2017) (quoting *Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 172 (2d Cir. 2009)).

In *Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 768 (7th Cir. 1982), an employment discrimination case to which the lodestar method applied, the court held that a federal district court "erred as a matter of law in limiting the hourly rates to local rates charged in" the area of South Bend, Indiana, where the court sat, and disallowing the rates charged by specialists from New York and Washington. In reaching its decision, the appellate court reasoned that, "[i]f a high priced, out of town attorney renders services which local attorneys could do as well, and there is no other reason to have them performed by the former, then the judge, in his [or her] discretion, might allow only an hourly rate which local attorneys would have charged for the same service." *Id.* "On the other hand," the court added, "there are undoubtedly services which a local attorney may

42

not be willing or able to perform." *Id.* "The complexity and specialized nature of a case may mean that no attorney, with the required skills, is available locally." *Id.*

Perhaps drawing on its own experience, the *Chrapliwy* court commented on the economics of the practice of law:

> Attorneys with specialized skills in a narrow area of law, such as admiralty law, patent law, or antitrust and other complex litigation, tend to be found in large cities, where an attorney may have a greater opportunity to focus on a narrow area of law. As a specialist, the attorney will usually charge more for performing services in his area of expertise than a general practitioner will charge for performing similar services. Furthermore, the costs of practicing law will vary from city to city, and such costs will be reflected in the rates of the attorneys.

*Id.* at 769.

The *Chrapliwy* court allowed that a judge "has discretion to question the reasonableness of an out of town attorney's billing rate if there is reason to believe that services of equal quality were readily available at a lower charge or rate in the area where the services were to be rendered." *Id.* "If, however, a party does not find counsel readily available in that locality with whatever degree of skill may reasonably be required, it is reasonable that the party go elsewhere to find an attorney, and the court should make the allowance on the basis of the chosen attorney's billing rate unless the rate customarily charged in that attorney's locality for truly similar services is deemed to require an adjustment." *Id.* Because the federal district court had limited the fees to the local rates "without any suggestion that the choice of counsel was improvident or counsel's billing rates were out of line with those charged by available counsel of similar expertise, otherwise similarly situated," the appellate court reversed. *Id.*; *accord Mathur v. Board*

43

*of Trs. of S. Ill. Univ.*, 317 F.3d 738, 744 (7th Cir. 2003) (in a federal employment discrimination case to which the lodestar method applied, reversing a decision lowering Chicago counsel's rates to local levels in southern Illinois, because the plaintiff had found that local attorneys had insufficient experience or could not represent him in litigation because of conflicts of interest); *see also McClain v. Lufkin Indus., Inc*., 649 F.3d 374, 383 (5th Cir. 2011) (in a federal employment discrimination case in which the lodestar method applied, holding that the trial court erred in reducing Los Angeles attorneys' rates to the rates in the Eastern District of Texas, because the record established that no local attorneys "were willing and able to assist in such a large case that might drag on for years without any guarantee of financial remuneration"); *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d at 178-79 (reversing a decision that reduced the rates of Richmond, Virginia, lawyers to the rates applicable in Charleston, West Virginia, when the issues included complex questions of preemption and constitutional law, and the representation could be politically sensitive for local lawyers).

When Mrs. Castruccio filed the caveat action in this case on March 27, 2013, Mr. Cawood, a civil practitioner whose firm consisted of two attorneys, represented the estate. Within two months, Mrs. Castruccio had filed three actions challenging the administration of the estate, and two more actions would be filed by April 22, 2014. Because Mr. Cawood was understandably unable to handle the anticipated barrage of litigation by himself, and because it was apparent that the litigation would involve challenging questions in the highly specialized area of estates and trusts, Mr. Greiber

retained DLA, a large firm with a number of eminently qualified attorneys.[31]  DLA

agreed to reduce its standard hourly rates and promised that its rates would not increase

throughout its representation, which has now lasted for more than seven years.

On the record compiled in the circuit court, there is simply no basis to conclude

that Mr. Greiber could find counsel "readily available" in Anne Arundel County with the

specialized experience, staffing resources, and financial wherewithal necessary to handle

a web of interconnected lawsuits, brought by a determined and well-funded adversary,

with a battalion of lawyers,[32] who was raising difficult questions in an arcane area of the

law.[33]  Nor is there any basis to conclude that Mr. Greiber could find counsel "readily

available" in Anne Arundel County who could afford to work, for an extended period of

time, on multiple pieces of protracted litigation, without being paid, as the estate's

counsel was required to do.  *See Mathur v. Board of Trs. of S. Ill. Univ.*, 317 F.3d at 744

(noting that the higher rates of out-of-town attorneys may be appropriate because "[l]ocal

---

[31] As just one example of the qualifications of the DLA attorneys in this case, the lead attorney, Mr. Stiller was a member of the Henderson Commission, which drafted the legislation that became the sections of the Estates and Trusts Article that pertain to decedent's estates.  *See* Shale D. Stiller and Roger D. Redden, *Statutory Reform in the Administration of Estates of Maryland Decedents, Minors and Incompetents*, 29 Md. L. Rev. 85, 85 (1969).

[32] As many as nine different lawyers have represented Mrs. Castruccio at any given time.  Five of the nine were based in the Baltimore metropolitan area.

[33] Only two Anne Arundel County attorneys are fellows of the prestigious American College of Trust and Estate Counsel, who are elected by their peers.  One of them represents Ms. Barclay; the other has a one-lawyer firm.  By contrast, in DLA's Baltimore office alone, four partners, including Mr. Stiller, are fellows of the American College of Trust and Estate Counsel.

attorneys could be overwhelmed with their current caseloads and unable to take on a potentially protracted litigation" or "the case may be too complex and require more resources than local law firms are able to provide").

For these reasons, we conclude that the circuit court abused its discretion in relying on the "locality" factor to further reduce DLA's already-discounted hourly rates for the fee award. We shall remand the case to the circuit court to reevaluate the fee petition, using the discounted fees that Mr. Greiber agreed to pay. The court is not required to conclude that the discounted hourly rates are reasonable, but it may not confine the rates to its conception of a reasonable rate in ordinary, conventional litigation in Anne Arundel County.[34]

## B. The Court Erroneously Deemed Certain Work Unnecessary

The estate contests the circuit court's decision that nearly 40 percent of the lawyers' work was unnecessary. Among other things, the estate argues that the court did not permit it to respond to the court's belated concerns about the specificity of the lawyers' time entries, that the court erroneously excluded all of the time billed for unsuccessful pretrial motions in the deed action, and that the court failed to articulate a basis for reducing some of the fees. These arguments have some merit. For those

---

[34] The circuit court judge, who presided over none of the litigation involving the estate except for the fee petition, asserted that "there is nothing novel or extraordinarily complex about the issues raised in any matters handled by counsel for the Estate." He added: "[T]he issues were not extraordinarily difficult." From the perspective of the appellate court that has handled approximately 10 appeals involving the Castruccio estate, we could not disagree more. The circuit court's statements are wrong as a matter of law. To the extent that questions of "novelty" or "complexity" could be said to involve factual determinations, the circuit court's statements are clearly erroneous.

separate and additional reasons, therefore, we shall vacate the attorneys' fee award and remand the case to the circuit court for reevaluation of the necessity of the lawyers' work, in accordance with this opinion.

### 1. *The Circuit Court's After-the-Fact Approach*

The estate contends that the circuit court impermissibly cut large portions of billed hours from the proposed fee without giving the estate an opportunity to address the court's concerns. We agree.

At the trial on the fee petition in this case, the estate introduced several days' worth of unrebutted testimony, including Mr. Rosenberg's unrebutted expert testimony, generally concerning the reasonableness of the fees and the necessity for the approximately 4000 hours of work that the lawyers had performed. The court, however, discouraged the parties from discussing specific time entries on the 100 or so pages of bills, correctly saying that "it would take weeks" to analyze each.

Yet in its opinion, issued 18 months after the trial, the court scoured the bills, complained that specific billing entries did not provide a sufficiently detailed explanation of the time spent on individual matters and said that it was therefore unpersuaded of the necessity of some of the work. It was an abuse of discretion for the court to base its decision on the putative inadequacy of the billing records, without first giving the estate the opportunity to address the court's concerns. *See Hutchinson v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1048 (7th Cir. 1994) (quoting *Smith v. Great American Restaurants, Inc.*, 969 F.2d 430, 440 (7th Cir.1992)) (holding that "'counsel is entitled to be heard on the matter before such a significant reduction in hours is made by the court'").

The court's approach was also inconsistent with the general principles that apply in reviewing claims for attorneys' fees. Attorneys are "not required to record in great detail how each minute of [their] time [is] expended." *Hensley v. Eckerhart*, 461 U.S. at 437 n.12; *see Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank, N.A.*, 400 Md. 718, 761 (2007) (recognizing that, in a case where some claims are subject to a contractual fee-shifting provision and others are not, it is "not always practicable" to precisely allocate the amount of time spent on one claim as opposed to another). Thus, for example, a court may award attorneys' fees and find the billing records to be adequate "'even if the description for each entry was not explicitly detailed,'" *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 553 (6th Cir. 2008) (quoting *McCombs v. Meijer, Inc.*, 395 F.3d 346, 360 (6th Cir. 2005)), such as when the lawyers "failed to identify the general subject matter of the activity involved," with entries such as "'Conference with,' 'Research,' 'Review file,' 'Review documents,' etc." *Id.* In a case like this, where the lawyers prepared the billing records with the expectation that they would become public before all of the underlying litigation had been resolved, it is completely understandable that the records may omit some details in order to avoid disclosing privileged, protected, or otherwise confidential or sensitive internal information. [35]

---

[35] Courts, however, may be skeptical of "block billing" – lumping multiple time entries into a single entry, and thus making it impossible to determine how much time was spent on any particular task. *See id.* at 553. The circuit court identified instances of block-billing on one of the billing records.

In reviewing petitions for the awards of attorneys' fees, "trial courts need not, and indeed should not, become green-eyeshade accountants." *Fox v. Vice*, 563 U.S. 826, 838 (2011). "The essential goal . . . is to do rough justice, not to achieve auditing perfection." *Id.* The court violated these principles in apparently disregarding the wealth of unrebutted testimony about what the lawyers did and why they did it, and proceeding instead like a billing auditor in writing off contemporaneous time entries that it regarded as insufficiently detailed.

On remand, if the court has specific questions about the necessity of performing specific tasks or about the content of the specific tasks performed, the court should permit the estate to offer an explanation. The court need not accept the explanation, but it is required to solicit and consider the explanation.

### 2. *The Fees for the Pre-Trial Motions*

The estate asserts that the circuit court improperly denied all fees related to eight pre-trial motions that it filed in the deed action, including motions in limine and a motion for summary judgment. Because the circuit court denied most of the pre-trial motions,[36] it concluded that counsel unnecessarily billed the 245.7 hours incurred on these matters.[37] In our judgment, the court abused its discretion in awarding no attorneys' fees for the

---

[36] The circuit court in the deed action granted one motion, denied five, and declared two to be moot.

[37] The estate proposed $864,366.00 in fees for the work on the deed action. The court awarded $382,345.00.

pursuit of the pretrial motions (apparently even the one that was granted) in this four-day bench trial.

A client may benefit from a pretrial motion even if it is denied. A pretrial motion may, for example, educate the court about legal or factual problems in the adversary's case, extract concessions from the adversary, or narrow the issues. In fact, in this case, at least one of the motions in limine became moot by stipulation, presumably because Mrs. Castruccio either withdrew a contention or announced that she would not pursue a line of attack.

Furthermore, even if they are denied, motions in limine will alert the court to an evidentiary issue that may arise and orient the court to the correct legal framework for approaching it. Because it is often prudent for a trial court to deny a motion in limine, even if it appears to be well founded, and to wait to see how an evidentiary issue presents itself in the context of the trial, it makes little sense to assert that a motion in limine will benefit the client only if it is granted.

In addition, in Maryland, a trial court may exercise its discretionary power to deny a motion for summary judgment even if the moving party has met the technical requirements for summary judgment – i.e., even if the moving party has shown that there is no genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See*, *e.g.*, *Dashiell v. Meeks*, 396 Md. 149, 165 (2006). The decision to deny summary judgment, as well as the decision to forego a ruling until later in the proceedings, "'involves not only pure legal questions but also an exercise of discretion as to whether the decision should be postponed until it can be supported by a complete factual record.'"

*Id.* at 164 (quoting *Metropolitan Mortg. Fund, Inc. v. Basiliko*, 288 Md. 25, 29 (1980)). In view of a trial court's discretion to deny even a meritorious motion for summary judgment, it makes little sense to apply an inflexible rule that a court can award the fees incurred in connection with a motion for summary judgment only if the motion is granted.

In a civil rights case, one federal appellate court has recognized that "courts may award fees for time reasonably spent on an unsuccessful argument in support of a successful claim." *Jaffee v. Redmond*, 142 F.3d 409, 414 (7th Cir. 1998). The court reasoned that "[i]f arguments that do not contribute to a plaintiff's ultimate success were not eligible for compensation for that reason alone, then attorneys might be discouraged from raising novel but reasonable arguments in support of their clients' claims." *Id*. at 417. "The ethics of the legal profession counsel an opposite approach." *Id*. (citing MODEL RULES OF PROFESSIONAL CONDUCT, Rule 1.3 cmt. 1 (1983)). Many state and federal courts generally recognize this same principle. *See*, *e.g.*, *Merriweather v. Family Dollar Stores of Indiana, Inc.*, 103 F.3d 576, 584 (7th Cir. 1996); *Robinson v. Point One Toyota, Evanston*, 77 N.E.3d 137, 152 (Ill. App. Ct. 2017); *Nagy v. Evansville-Vanderburgh Sch. Corp.*, 870 N.E.2d 12, 25 (Ind. Ct. App. 2007)).[38]

---

[38] In *Congressional Motel Corp. v. Mervis Diamond Corp*., 200 Md. App. 489, 506-07 (2011), this Court relied on *Jaffee v. Redmond* in holding that a prevailing party could recover the attorneys' fees that it incurred in a new trial that was necessitated by a reasonable but unsuccessful argument at the first trial, as well the attorneys' fees that it incurred in an appeal from the new trial.

Finally, it bears mention that, under ET § 7-603, the statute on which the fee petition is based, when the fiduciary of the estate "defends or prosecutes a proceeding in good faith and with just cause," he or she "shall be entitled to receive the necessary expenses and disbursements from the estate *regardless of the outcome of the proceeding*." (Emphasis added.) From the plain language of the statute, it is apparent that a fiduciary is ordinarily entitled to the fees and expenses incurred in pursuing unsuccessful motions, unless, perhaps, the denial of the motion suggests a lack of good faith or just cause or the absence of necessity.

We hold that the court abused its discretion in applying the inflexible, categorical rule that the fiduciary of an estate cannot recover the attorneys' fees incurred in connection with pretrial motions unless those motions are granted. On remand, the court should conduct a nuanced inquiry into the reasonableness of the arguments that were advanced in those motions and the extent, if any, to which they may have benefitted the estate. The court may find that some of the fees incurred in the pretrial motions were unreasonable or that the estate's attorneys spent more time on the motions than was warranted. "This is very different, however, from a decision that all such fees must be categorically denied because they were incurred in support of a losing argument." *Jaffee v. Redmond*, 142 F.3d at 415.

### 3. *The Putative Absence of An Explanation for Some Reduction*

When a trial court declines to award all or part of the requested fee, it must provide a "'concise but clear explanation'" *Flaa v. Manor Country Club*, 158 Md. App. 483, 496 (2004), *rev'd on other grounds*, 387 Md. 297 (2005) (quoting *Smith v. Great*

52

*American Restaurants, Inc*., 969 F.2d at 439), that allows for "'an appropriate basis for meaningful appellate review.'" *Id.* (quoting *Hutchinson v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1048 (7th Cir. 1994)).[39] A trial court's "expression of general concerns" will not justify cuts in billable hours. *Hutchinson v. Amateur Elec. Supply, Inc.*, 42 F.3d at 1048 ); *accord Matter of Continental Illinois Secs. Litig.*, 962 F.2d 566, 570 (7th Cir. 1992) (stating that a court cannot deny large portions of fees "on the basis of [its] inarticulable and unsubstantiated dissatisfaction with the lawyers' efforts to economize on their time and expenses").

The estate argues that the court gave no examples of excessive time, but instead "just had a gestalt reaction that there was too much." *Matter of Continental Illinois Secs. Litig.*, 962 F.2d at 570. For the most part, we disagree.

In reducing the requested fees, the court routinely gave some explanation that would afford the required basis for appellate review. *Flaa v. Manor Country Club*, 158 Md. App. at 496. For example, in eliminating a considerable portion of the fees billed by the DLA lawyers in the first removal action, the court reasoned that Mr. Cawood could have handled the action on his own. Similarly, in eliminating almost all of the fees billed by the DLA lawyers in the two appeals of the second removal action, the court reasoned that the lawyers should have known that the record did not support an award of attorneys'

---

[39] The Court of Appeals reversed this Court's opinion in *Flaa* because the trial court was required to use criteria provided in the Montgomery County Code to calculate an attorneys' fee award, rather than the lodestar approach that this Court approved. *Manor Country Club v. Flaa*, 387 Md. 297, 321 (2005). Still, language from an opinion that is reversed on other grounds may remain persuasive authority if founded on sound reasoning. *See West v. State*, 369 Md. 150, 157 (2002).

fees against Mrs. Castruccio. The estate does not argue that those explanations were wrong, so we do not consider whether they were.

On the other hand, the court eliminated over 200 hours of the 534.9 hours billed on what it called "indeterminate" or "indeterminable" entries – i.e., entries that the court, using its own resources, could not assign to any particular one of the several matters on which the lawyers worked. The court wrote off only 40 of the 240 hours billed by Mr. Cawood because they appeared to relate to discovery matters in the will construction action, in which he had billed only 5.7 hours. The court, however, gave no explanation for why it wrote off over 100 hours billed by the DLA lawyers, but allowed others. The court erred in reducing the requested fees without articulating an objective basis for its decision. *Flaa v. Manor Country Club*, 158 Md. App. at 496. [40]

## C. __Further Aspects for the Circuit Court to Consider__

Maryland courts are permitted to consider relevant factors besides those set forth in Rule 1.5 when calculating a reasonable fee award. *Monmouth Meadows Homeowners Ass'n, Inc. v. Hamilton*, 416 Md. at 337-38 (stating that "[a] trial court also may consider,

---

[40] The estate argues that, in reducing most of the fees billed by DLA in the second removal action, the circuit court confused that action with the contempt action, for which the estate seeks no fees. The estate is correct that, in its discussion of the second removal action, the circuit court discussed the contempt action at great length and concluded that the estate "benefitted not at all" from the lawyers' efforts in the contempt action. The court, however, went on to say that "[t]he effort to seek counsel fees against [Mrs. Castruccio] and her counsel [in the second removal action] mirrors the approach taken in the contempt action." In light of that comment, we understand the court to mean that, just as the estate benefitted not at all from the lawyers' conduct in the contempt action, so too did the estate benefit not at all from the DLA lawyers' similar conduct in the second removal action. The court did not confuse the contempt action with the second removal action.

in its discretion, any other factor reasonably related to a fair award of attorneys' fees"); *accord CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 429 Md. 387, 465 (2012); *Ochse v. Henry*, 216 Md. App. 439, 452-53 (2014). On remand, the circuit court should consider several other aspects of the Castruccio litigation in determining an appropriate attorneys' fee award.

First, the circuit court should consider the actions of the beneficiaries in relation to the litigation. Courts allow large fee awards if the beneficiaries or other interested parties have prolonged or complicated the litigation. *See Skinner v. Morrow*, 318 S.W.2d 419, 425 (Ky. Ct. App. 1958) (affirming "liberal" fee for administrator's attorney because the "litigation was prosecuted with exceeding vigor by the attorney for the paternal heirs," and "much of the litigation was needless and useless, and . . . unnecessarily large" through no "fault of the administrator or its attorney"); *In re Bush's Estate*, 230 N.W.2d 33, 43 (Minn. 1975) (affirming large award for probating substantial estate because the beneficiaries had prolonged the litigation); *In re Estate of Burch*, 586 A.2d 986, 987-88 (Pa. Super. Ct. 1991) (affirming substantial fee because the prolonged estate litigation was caused by negotiations with disinherited heirs, disputes between claimants, and acrimony between executors); *Segall v. Shore*, 236 S.E.2d 316, 319-20 (S.C. 1977) (affirming large fee award for executor's attorneys in ongoing litigation of five years that involved a "lack of cooperation and resistance" by the beneficiaries). Under this factor, Mrs. Castruccio's aggressive, multi-front offensive against the estate, the validity of the will, the personal representative's interpretation of the will, and the personal representative himself may have some bearing on the fee award.

Courts have also approved relatively large fee awards when the beneficiaries approved of or instigated the litigation. *See Succession of Gomez*, 78 So.2d 411, 418 (La. 1955) (approving ordinarily excessive fee because the executrix's attorney had "been called upon to represent the estate in a good deal of litigation" initiated by the estate's heirs); *In re McInnis' Will*, 91 N.Y.S.2d 806, 812 (Sur. Ct. 1949) (affirming "abnormally large" fee because both beneficiaries of the estate "insisted that the attorneys representing [them] carry on the litigation" and "each [beneficiary] had the right to spend her own money in the manner she insisted upon"). Under this factor, it may be relevant that Ms. Barclay, the principal beneficiary of the estate, appears not to challenge the reasonableness of the fees or the necessity of the work that the attorneys performed.

Finally, the court may consider whether the personal representative had an opportunity to reach a reasonable settlement with the opposing party. Courts have held that if a personal representative "believed the claim [against the estate] was unjust[,] it was his duty to contest it," and therefore he was under no obligation to settle. *May v. Sansberry*, 86 N.E.2d 88, 90 (Ind. Ct. App. 1949); *see also In re Craig's Estate*, 57 Pa. D. & C. 97, 101 (Orphans' Ct. 1947) (refusing to authorize a proposed settlement for a claim against an estate because of the court's "grave doubt as to the validity of the claim," even though "the litigation . . . will be long and costly"). Under this factor, a court should consider whether the fiduciary of the estate proceeded reasonably in the face of a difficult choice between acquiescing in an unreasonable settlement with a person who was pursuing unmeritorious claims and using the estate's assets to continue to defend against those unmeritorious claims.

**III.** **The Requested Apportionment of the Estate's Attorneys' Fees**

Darlene Barclay, a beneficiary of the estate, appeals the circuit court's denial of her request to apportion the attorneys' fees to Mrs. Castruccio's share of the estate because of her alleged bad faith. We see no abuse of discretion in the court's decision not to charge the estate's fees against Mrs. Castruccio's interest in the estate.

Ms. Barclay cites a total of one Maryland case in support of her contention that the court could and should have required Mrs. Castruccio to bear the estate's legal fees: *Hitchens v. Safe Deposit & Trust Co.*, 193 Md. 62 (1949). There, the Court of Appeals exercised its discretion to order that the costs of the appeal – not the personal representative's attorneys' fees – be paid from the share of the beneficiary who had pursued an unsuccessful appeal. *Id.* at 67. *Hitchens* does not stand for the proposition that a court may order that the estate's attorneys' fees should be paid out of the share of a beneficiary who engaged in unsuccessful litigation against the estate.

Ms. Barclay cites authorities from other jurisdictions that, she says, vest courts with the discretion to require an unsuccessful litigant to bear the estate's attorneys' fees. Often, however, the court's discretion is granted or limited by statute. George Taylor Bogert, *The Law of Trusts and Trustees* § 971 (2016). We have no such statute in Maryland.

Furthermore, according to the authorities cited by Ms. Barclay, a court may charge the estate's attorneys' fees against a beneficiary's share when the beneficiary causes

"unnecessary litigation,"[41] or brings a "groundless"[42] or "unfounded"[43] suit, or questions the validity of the trust or will capriciously or without reason, raises improper questions, causes unnecessary delay or expense or litigates maliciously.[44]  In this case, however, the circuit court repeatedly found that Mrs. Castruccio had acted in good faith.  Ms. Barclay agrees that we review that finding for abuse of discretion.  "A court's decision is an abuse of discretion when it is 'well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.'"  *Moreland v. State*, 207 Md. App. 563, 569 (2012) (quoting *Gray v. State*, 388 Md. 366, 383 (2005)) (further quotation marks omitted).  We see no abuse of discretion.

The caveat action involved difficult questions concerning the formal requirements of a valid will, including the requirements described in an elusive 1921 opinion of the Court of Appeals.  "A treatise, of which Ms. Barclay's lawyer was one of the co-authors, contained language that appeared to support Mrs. Castruccio's central contention."  *Castruccio v. Estate of Castruccio*, 239 Md. App. 345, 379 (2018).  "In addition, on at least two occasions, Maryland's appellate courts had reiterated, if they had not reaffirmed, the ruling on which Mrs. Castruccio relied."  *Id.*  The caveat case was not finally settled until the Court of Appeals had spoken, in the second of two reported

---

[41] *Boston Safe Deposit & Tr. Co.*, 203 N.E.2d 547, 554 (Mass. 1965).

[42] *Patterson v. Northern Tr. Co.*, 122 N.E. 55, 56 (Ill. 1919).

[43] *Conley v. Waite*, 25 P.2d 496, 496-97 (Cal. Dist. Ct. App. 1933).

[44] *Klinkerfuss v. Cronin*, 199 S.W.3d 832, 846 (Mo. Ct. App. 2006).

opinions on the subject. *Castruccio v. Estate of Castruccio*, 456 Md. 1 (2017). Indeed, this Court held that Mrs. Castruccio had "probable cause," within the meaning of ET § 4-413, to pursue the caveat action, and hence that Dr. Castruccio's will was void to the extent that it purported to penalize her for contesting it. *Castruccio v. Estate of Castruccio*, 239 Md. App. at 379. In these circumstances, it might well have been an abuse of discretion for the court not to find that Mrs. Castruccio acted in good faith.

Similarly, the will construction action involved difficult questions concerning the correct interpretation of Dr. Castruccio's "sloppily drafted will." *Id.* at 376. Among other things, the action involved the subtle distinction between extrinsic evidence, which a court generally cannot consider in interpreting a will, and the circumstances surrounding the execution of a will, which a court can consider for some interpretive purposes. *See id.* at 361-65. The case resulted in a reported decision of this Court, which means that it was "of substantial interest" as a precedent. Md. Rule 8-605.1(a). Mrs. Castruccio did not proceed in bad faith when she advocated a position that was not clearly foreclosed by existing precedent.

The deed action was not resolved until the court denied the estate's motion for summary judgment and conducted a four-day bench trial. Yet if the issues were sufficiently debatable to persuade the court that a trial was necessary or desirable, they must also have been sufficiently debatable to justify Mrs. Castruccio's prosecution of the case. *See State v. Braverman*, 228 Md. App. 239, 261 (2016) (citing *Needle v. White, Mindel, Clark & Hill*, 81 Md. App. 463, 478-80 (1990)). In this regard, we note that even though Mrs. Castruccio was ultimately unable to prove that her signature had been forged

(i.e., signed without her authorization) on the various deeds that were involved in the deed action, she did uncover troubling improprieties in the handling of the Castruccios' affairs by Mr. Greiber's office, including having notaries falsely attest that Mrs. Castruccio had appeared before them and executed the deeds.

In the second removal action, the circuit court specifically found that Mrs. Castruccio did not act in bad faith. Consequently, the court revoked an earlier order requiring her to pay the estate's attorneys' fees under Rule 1-341 (which concerns proceedings brought in bad faith or without substantial justification) and Rule 6-141 (the analog to Rule 1-341 in orphans' court proceedings). In view of circuit court's decision not to require Mrs. Castruccio to pay the estate's fees, it is difficult to envision how the court could later charge some or all those fees against Mrs. Castruccio's share of the estate.[45]

Finally, we agree that one certainly could question Mrs. Castruccio's good faith in the first removal action, which she abruptly dismissed after the orphans' court excluded her expert as a discovery sanction. Nonetheless, the circuit court rejected the contention that Mrs. Castruccio's case was meritless. The court explained that the petition for removal raised "serious allegations" regarding "various alleged improprieties" on the part

---

[45] Citing decisions from other jurisdictions, Ms. Barclay argues that a court of equity may charge the estate's attorneys' fees against a beneficiary's interest even if the beneficiary's conduct was not sufficiently opprobrious as to violate Rule 1-341 or Rule 6-141. On the basis of the information in the briefs, we have no idea what the contours of that putative standard might be. For example, how could a court determine that a proceeding was "unjustified" even though a beneficiary had substantial justification for pursuing it?

of Mr. Greiber.  The allegations did not become meritless when Mrs. Castruccio was precluded from proving them as a result of her misconduct in discovery.

Ms. Barclay argues, at length, that the circuit court erred in concluding that Mrs. Castruccio's claims had merit and that she did not proceed in bad faith.  In substance, Ms. Barclay recounts the factual arguments that the circuit court heard, but rejected.  Because the record contains evidence to support the factual findings that the court made, it was not required to accept Ms. Barclay's arguments.

Finally, Ms. Barclay argues that the court abused its discretion in declining to permit a DLA attorney to testify about a statement that Mrs. Castruccio (or perhaps one of her lawyers) allegedly made in mediation.  According to Ms. Barclay, the alleged statement, which is not clearly disclosed in the record, would prove Mrs. Castruccio's bad faith.

Ms. Barclay had to overcome at least two evidentiary obstacles to the admission of the alleged statement: Maryland Rule 5-408 and Md. Code (1973, 2013 Repl. Vol., 2019 Supp.), §§ 3-1803 and 3-1804 of the Courts and Judicial Proceedings ("CJP") Article.

Under Rule 5-408(a), evidence of "[c]onduct or statements made in compromise negotiations or mediation" is "not admissible to prove the validity, invalidity, or amount of a civil claim in dispute."  The obvious purpose of the rule is to encourage candor during settlement discussions by prohibiting one party from exploiting another party's concessions.  Nonetheless, the rule "does not require the exclusion of any evidence otherwise obtained merely because it is also presented in the course of compromise negotiations or mediation."  Md. Rule 5-408(b).  Furthermore, "[e]xcept as otherwise

provided by law, evidence of "[c]onduct or statements made in compromise negotiations or mediation" is not excluded by Rule 5-408 if it is offered for some purpose other than proving the "validity, invalidity, or amount of a civil claim in dispute." *See* Md. Rule 5-408(c). Ms. Barclay argues that she did not offer Mrs. Castruccio's alleged statement to prove the "validity, invalidity, or amount of a civil claim in dispute," but for another purpose — to prove that she was litigating in bad faith. We assume for the sake of argument that she overcame the obstacle of Rule 5-408.

The second obstacle is CJP §§ 3-1803 and 3-1804, which are part of the Maryland Mediation Confidentiality Act, enacted in 2012. In general, the Act applies when:

(1) The parties are required to mediate by law;

(2) The parties are referred to mediation by an administrative agency or arbitrator; or

(3) The mediator states in writing to any and all parties to the mediation and persons with whom the mediator has engaged in mediation communications that:

    (i)     The mediation communications will remain confidential in accordance with this subtitle; and

    (ii)    The mediator has read and, consistent with State law, will abide by the Maryland Standards of Conduct for Mediators during the mediation.

*See* CJP § 3-1802(a).[46]

---

[46] The Act does not apply to a mediation:

(1) To which Title 17 of the Maryland Rules applies;

(2) Relating to the establishment, negotiation, administration, or termination of a collective bargaining relationship;

62

In general, under CJP § 3-1803(b)(1), "[a] party" to such a mediation "and any

person present or otherwise participating in the mediation at the request of a party may

not disclose or be compelled to disclose mediation communications in any judicial,

administrative, or other proceeding." Under CJP § 3-1804(c), however, "[a] court may

order mediation communications to be disclosed," but "only to the extent that the court

determines that the disclosure is necessary to prevent an injustice or harm to the public

---

(3) Relating to a dispute that is pending under, or is part of the processes established by, a collective bargaining agreement unless the dispute has been filed with an administrative agency or court;

(4) Relating to an action to enforce an agreement to arbitrate under common law, the Federal Arbitration Act, the Maryland Uniform Arbitration Act under Subtitle 2 of [Title 3 of the Courts and Judicial Proceedings Article], or the Maryland International Commercial Arbitration Act under Subtitle 2B of [Title 3 of the Courts and Judicial Proceedings Article];

(5) Relating to an action to foreclose a lien against an owner-occupied residential property subject to foreclosure mediation conducted by the Office of Administrative Hearings under Maryland Rule 14-209.1;

(6) Arising from a referral of a matter to a magistrate, examiner, auditor, or parenting coordinator under Maryland Rules 2-541, 2-542, 2-543, or 9-205.2; or

(7) Conducted by a judge who might make a ruling on a case based on the dispute.

CJP § 3-1802(b).

Furthermore, "[t]he parties and the mediator, by a written and signed agreement made in advance of the mediation, may agree to exclude all or part of the mediation communications from the application of" the statute. CJP § 3-1802(c).

63

interest that is of sufficient magnitude in the particular case to outweigh the integrity of mediation proceedings."[47]

The briefs shed little light on how Rule 5-408 is supposed to interact with §§ 3-1803 and 3-1804. To the extent that there is an inconsistency between the two enactments, the later-enacted statutes would take precedence over the rule, at least as to statements made in a mediation to which the statutes apply. *See* Md. Const., Art. IV, § 18(a) (providing that rules adopted by the Court of Appeals concerning the practice, procedure, and administration of courts in this State "have the force of law until rescinded, changed or modified by the Court of Appeals or otherwise by law"); *Hensley v. Bethesda Sheet Metal Co.*, 230 Md. 556, 561 (1963).[48] Thus, it appears that, in

---

[47] Under CJP § 3-1804(b), a mediator and a participant in the mediation may disclose mediation communications, without a court order:

(1) To a potential victim or to the appropriate law enforcement authority to the extent that the mediator, party, or person reasonably believes the disclosure is necessary to prevent bodily harm or death to the potential victim;

(2) To the extent necessary to assert or defend against allegations of mediator misconduct or negligence;

(3) To the extent necessary to assert or defend against allegations of professional misconduct or malpractice by a party or any person who was present or who otherwise participated in the mediation at the request of a party, except that a mediator may not be compelled to participate in a proceeding arising out of the disclosure; or

(4) To the extent necessary to assert or defend against a claim or defense that, because of fraud, duress, or misrepresentation, a contract arising out of a mediation should be rescinded or damages should be awarded.

[48] When a "statute adopted by the Legislature and the rule promulgated by the Court of Appeals are inconsistent[,]" the "later adopted provision" prevails. *Schlick v.*

general, all statements made in a court-ordered mediation are effectively inadmissible (in that the participants are prohibited from disclosing them) even if they might not be excluded by Rule 5-408. A person may disclose those statements only if a court "determines that the disclosure is necessary to prevent an injustice or harm to the public interest that is of sufficient magnitude in the particular case to outweigh the integrity of mediation proceedings." CJP § 3-1804(c). Rule 5-408 appears to apply only to statements made outside the framework of a formal mediation or to statements made in a mediation to which the Act does not apply.

The circuit court declined to admit Mrs. Castruccio's alleged statement, expressly finding, under CJP § 3-1804(c), that the prospect of injustice or harm to the public interest did not outweigh the interest in upholding the integrity of the confidential mediation. In general, we review a circuit court's evidentiary decisions for abuse of discretion. *See*, *e.g.*, *Walter v. State*, 239 Md. App. 168, 200 (2018).

In this case, it is difficult to evaluate whether the court abused its discretion in not admitting evidence of Mrs. Castruccio's alleged statement, because we have no clear indication of what Mrs. Castruccio is actually supposed to have said. *See University of Maryland Med. Sys. Corp. v. Waldt*, 411 Md. 207, 235-36 (applying Md. Rule 5-103(a)(2)). At most, we are told, through an evidentiary proffer, that the statement "would have to do with the nature of Sadie Castruccio's intention in litigating and

---

*State*, 238 Md. App. 681, 691 (2018), *aff'd*, 465 Md. 566 (2019); 66 Op. Att'y Gen. Md. 80, 84 (1981) (concluding that, "as between an inconsistent rule of the Court of Appeals and a statute enacted by the General Assembly, the last enacted will prevail").

continuing to litigate and how that would affect the amount of the – ultimate amount – the amount – the ultimate amount of the estate that would go to Ms. Barclay." In translation, that ambiguous statement may mean little more than that if Mrs. Castruccio's adversaries did not settle on her terms, the costs of litigation would reduce Ms. Barclay's recovery if she prevailed (just as it would reduce Mrs. Castruccio's recovery if she prevailed). A statement of that sort does not evidence bad faith; it expresses the reality of litigation.

The court would not have abused its discretion in excluding the alleged statement even if it deserved a more malevolent interpretation — i.e., even if the statement were interpreted to mean that Mrs. Castruccio did not care whether she lost, as long as she succeeded in reducing Ms. Barclay's ultimate recovery. From the extensive record that the parties compiled during this multi-faceted litigation, the court could evaluate whether Mrs. Castruccio had proceeded in bad faith without taking a detour into what she may have said and why she may have said it during a confidential mediation session. The court, therefore, was well within its rights when it concluded that the disclosure of Mrs. Castruccio's alleged statement was not "necessary to prevent an injustice or harm to the public interest that is of sufficient magnitude in the particular case to outweigh the integrity of mediation proceedings." CJP § 3-1804(c).

## CONCLUSION

The circuit court correctly denied Mrs. Castruccio's and Ms. Barclay's exceptions to the interim petition for attorneys' fees. The circuit court, however, abused its discretion in calculating the amount of fees and expenses that the fiduciary of the estate

66

can pay, from the estate's assets, to his attorneys.  We therefore vacate the award and

remand to the circuit court to calculate an award in accordance with this opinion.[49]

> **JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AWARDING ATTORNEYS' FEES VACATED; JUDGMENT AFFIRMED IN ALL OTHER RESPECTS; CASE REMANDED TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID EQUALLY BY SADIE CASTRUCCIO AND DARLENE BARCLAY.**

---

[49] The estate argues that we should not remand the case, but should simply direct the entry of judgment in the full amount requested.  We can do no such thing.  As an appellate court, we are unable to make the requisite findings concerning the reasonableness of the requested fees and expenses and the necessity of the work performed.  It makes no difference that the estate's evidence is largely undisputed.  Even when the party with the burden of proof puts on undisputed evidence, the finder of fact – in this case, the circuit court – is not required to be persuaded.

# APPENDIX A

Mrs. Castruccio presented the following questions for our review:

I.  Did the trial court erroneously conclude that Greiber had the authority to retain the lawyers to prosecute and defend litigation on behalf of the estate?

II.  Was the petition deficient because it did not set forth an estimate of future requests, and did the trial court fail to make the finding mandated by § 7-602(C)?

III.  Was it proper for the trial court to award fees and expenses for activities he found were not reasonable or necessary?

IV.  Does Maryland Rule 2-703 apply to this case?

V.  Are the trial judge's findings of fact that portions of the lawyers' charges did not meet the statutory criteria clearly erroneous [sic]?

VI.  Given the evidence before the court and the findings of multiple other courts[,] was the trial court's finding that Sadie did not act in bad faith clearly erroneous?

The estate presented the following questions for our review:

I.  Did the AACourt [the Circuit Court for Anne Arundel County] err in reducing Piper's hourly rates to comport with the AACourt's own purported knowledge of local Anne Arundel County rates for similar cases?

II.  Did the AACourt err in holding that certain of the Estate's counsel's efforts were "unnecessary" and otherwise arbitrarily eliminating hours actually worked by counsel, despite the Estate's being a successful *defendant* in Sadie's onslaught of litigation?

Darlene Barclay presented the following questions for our review:

I.  Did the Circuit Court apply an incorrect legal standard to the Fee Shift Claim by focusing solely on the basis for Sadie's allegations at the time her various cases were filed, and by failing [to] analyze factors

identified in equity jurisprudence and under the Maryland Rules as indicative of bad faith and/or as meriting a fee shift in equity?

II.     Did the Circuit Court make a clearly erroneous factual determination when it relied on the Circuit Court's lack of an express "bad faith" finding in the Deed Action to determine that Sadie did not litigate the Deed Action in bad faith, without substantial justification, and that no fee shift was merited in equity, given that those issues were never actually litigated in the Deed Action?

III.    Did the Circuit Court err by not admitting testimony falling into the evidentiary exception that permits admission of statements made during mediation for a purpose other than proving the validity or invalidity or amount of the claim?

# APPENDIX B

file SB88

LAW OFFICES OF
## PIPER & MARBURY
1100 CHARLES CENTER SOUTH
36 SOUTH CHARLES STREET
BALTIMORE, MARYLAND 21201

TELEPHONE: 301-539-2530

October 9, 1979

The Honorable J. Joseph Curran, Jr.
207 Blaustein Building
Charles and Fayette Streets
Baltimore, Maryland 21201

           Re:   Powers and Duties of a
                Special Administrator

Dear Senator Curran:

      Enclosed for your consideration is a Bill dealing with the powers and duties of a special administrator, which the Maryland Bar Association Section of Estate and Trust Law would appreciate your sponsoring in the coming Legislative Session. The text of the proposed Bill has been reviewed and approved by Skip Buppert.

      You may recall that late in the 1979 Legislative Session, a similar Bill was introduced by the Section of Estate and Trust Law through Joe Owens in the House of Delegates. Although favorably reported by his Committee and passed by the House, the Bill failed to win Senate approval in the final days of the Session.

      As you know, a special administrator, under Subtitle 4 of Title 6 of the Estates and Trusts Article of the Annotated Code of Maryland may be appointed prior to, or upon the termination of, the appointment of a personal representative. A special administrator's duties are intended to be temporary in nature, and to promptly terminate upon the appointment of a personal representative. Under Section 6-403 of the Estates and Trusts Article, the special administrator is granted broad powers to preserve the estate's property prior to the appointment of a personal representative. However, existing law does not impose upon the special administrator any duty to account for the property of the estate during his appointment, or to carry out any other unperformed duties of a personal representative. If, for example, an inventory has never been filed in an estate, a special administrator is under no express duty to do so. Similarly, there is no duty to account to the

PIPER & MARBURY

court, or to the beneficiaries of the estate, during his tenure as special administrator. Although the lack of any requirement to carry out duties such as these should not present a problem where the appointment is of short duration, the problem does become significant when a special administrator serves over a period of several months or years. Where, for example, the appointment of a personal representative is terminated upon a petition to caveat, the proceeding may be carried on for several years, during which time a special administrator will be charged with the preservation of the estate. The Section believes that it is important, in such circumstances, that a special administrator be required to carry out certain duties that would be imposed upon a personal representative.

The enclosed amendment to Section 6-403 simply requires the special administrator to carry out any unperformed duties imposed upon a personal representative under Subtitles 2, 3 and 5 of Title 7. Subtitle 2 requires inventories and appraisals, Subtitle 3 requires accountings and Subtitle 5 requires notice to interested persons upon the filing of an account and any proposed payment to a personal representative or attorney.

In all other respects, Section 6-403 would remain unchanged.

It is our hope that the enclosed Bill can be prefiled in both the House and Senate. Delegate Owens has already expressed his willingness to sponsor the Bill in the House, and we would very much appreciate your agreement to do the same in the Senate.

We are available to discuss any of this with you at your convenience.

Sincerely,

Earl S. Wellschlager

ESW:vc
Stuart George Buppert, Esq.

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/1023s18cn.pdf

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/1023s18cn2.pdf

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/1023s18cn3.pdf